**In re Maxine B. BELL, Debtor.**

**Maxine B. Bell, and Edward Sparkman, Trustee, Plaintiffs,**

v.

**Parkway Mortgage, Inc., and Stephen Flacco, t/a Wharton Investments Network, Defendants.**

**Bankruptcy No. 01–14420 KJC. Adversary No. 01–392 KJC.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 14, 2004.

David A. Scholl, Law Office of David A. Scholl, Newtown Square, PA, for Debtor/Plaintiff.

Alan C. Gershenson, Paul H. Schieber, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Anthony M. Pugliese, Madden, Madden & Del Duca, Haddonfield, NJ, for Defendants.

## MEMORANDUM OPINION[1]

KEVIN J. CAREY, Bankruptcy Judge.

### BACKGROUND

On May 30, 2001, Maxine B. Bell (the "Debtor") and the chapter 13 trustee Edward Sparkman (together, the "Plaintiffs") filed a complaint against Parkway Mortgage, Inc. ("Parkway") and Stephen Flacco, t/a Wharton Mortgage Investments ("Wharton") asserting claims in connection with an alleged predatory loan transaction that occurred on June 30, 1999 (the "Closing Date"). The Debtor filed an amended complaint on February 5, 2002 (the "Amended Complaint"), as permitted by an amended pre-trial order dated January 22, 2002. The Amended Complaint asserts four counts against the defendants as follows:

- Count I seeks rescission of the loan transaction, statutory damages and attorney fees against Parkway for violations of the Home Ownership Equity Protection Act, 15 U.S.C. § 1639(a) *et seq.* ("HOEPA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, ("TILA");

- Count II seeks an order invalidating the mortgage (*see* Ex. D–3, the "Mortgage") dated June 30, 1999 given by the Debtor to Parkway as security for the Balloon Note (*see* Ex. P–1) for failure to obtain a proper notarization;

- Count III seeks statutory and punitive damages and attorney fees against

---

1. This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The parties agree this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(K) and (O). *See* Joint Pre–Trial Statement, p. 1.

Parkway and Wharton, jointly and severally, based upon Wharton's fraudulent conduct, breach of fiduciary duty to the Debtor and violation of the Pennsylvania Credit Services Act, 73 P.S. § 2188(c)(2); and

- Count IV seeks treble damages and attorney fees against Parkway and Wharton, jointly and severally, for their violations of the Pennsylvania Home Improvement Finance Act, 73 P.S. § 500–101 *et seq.* ("HIFA") and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*, ("CPL").

On February 7, 2002, Parkway filed an answer to the Amended Complaint, including a cross-claim against Wharton.[2] On February 11, 2002, Wharton filed an answer to the Amended Complaint, including a cross-claim against Parkway.[3] The parties filed a Joint Pre–Trial Statement on March 20, 2003 (the "JPS"), which was amended by Wharton on March 27, 2003. Trial was held on April 3, 2003 and, thereafter, the parties each filed proposed findings of fact and conclusions of law.

### FINDINGS OF FACT

The Debtor is a high school graduate, who attended more than three years of college courses at Temple University. (Tr. at 47–48).[4] She has worked for the Social Security Administration for twenty years. (Tr. at 7). The Debtor owns real property located at 1619 Olive Street, Philadelphia, PA (the "Property"). The Debtor responded to a newspaper advertisement offering the possibility of free home improvements. (Tr. at 6). A few months later, she began to get telephone solicitations from an individual named "Vince" regarding home repair work, and she believes he obtained information about her based upon her response to the advertisement, since her phone number is unlisted.[5] (Tr. at 6–7). She agreed to make an appointment with him at her home. (Tr. at 8). They discussed various work that she needed done on the house and agreed that Vince would try to provide financing and a contractor so that she could have approximately $8,000 to $8,500 worth of improvements made to the walls of her Property. (Tr. at 8–9). The Debtor understood from the beginning that Vince was a broker and not a contractor. (Tr. at 48).

Vince asked the Debtor to make a list of her monthly bills and then suggested that he could consolidate her monthly payments by trying to obtain financing that would include the home repair loan, refinance of two mortgages she had on the Property,

---

**2.** Parkway's cross-claim against Wharton seeks indemnification for any sums which Parkway is ordered to pay to the Debtor and for any damages sustained by Parkway due to rescission or other equitable remedy awarded to the Debtor. On February 7, 2002, Parkway also filed a Third Party Complaint against Steven Sacks and Montgomery Land Transfer, Inc., successor to Rittenhouse Abstract Suburban, Inc. On March 8, 2002, the Third Party Complaint was dismissed against Montgomery Land Transfer, Inc. On April 3, 2002, default judgment on the Third Party Complaint was entered against Steven Sacks.

**3.** Wharton's cross-claim against Parkway similarly seeks indemnification from Parkway for any damages sustained by Wharton due to rescission or other equitable remedy awarded to the Debtor. Parkway filed an answer to the cross-claim on February 12, 2002, denying any liability to Wharton.

**4.** Transcript citations refer to the trial held on April 3, 2003.

**5.** Although the Debtor did not know Vince's last name, testimony by Linda Groman, the president of the title insurance company involved in this loan transaction, Rittenhouse Abstract Suburban, Inc. ("Rittenhouse"), revealed Vince's full name to be Vince Corelli. (Tr. at 116).

and payment of some of the Debtor's other bills. (Tr. at 14). In their discussions, she told him that the new mortgage payments should be approximately $450 to $470 per month, and the duration of the loan should be no more than 15 years. (Tr. at 15–16). Vince said that interest would be at "market rate." (Tr. at 16). There were no discussions about a balloon payment. (*Id.*). The only person she spoke to in connection with obtaining a loan was Vince. (Tr. at 11).

On June 30, 1999, Vince brought a number of documents to the Debtor's residence for her to sign. (Tr. at 11). Although the Debtor's daughter was home at the time, only the Debtor and Vince were present when she signed the documents. (Tr. at 13). Vince briefly explained the papers that he asked her to sign, so she didn't look at them or question them because she trusted that "he was handling everything for [her]." (Tr. at 59–60).

The Debtor admitted that her signature appears on the Federal Truth–in–Lending Disclosure Statement (Ex. D–1), Notice of Right to Cancel (Ex. D–2), and Mortgage (Ex. D–3), but she maintains that a lot of the papers Vince gave her to sign had blank spaces. (Tr. at 15–22). Steven Sacks, the notary on the Mortgage, was not present at signing. (Tr. at 22–23). The Debtor testified that she did not sign the HUD–1 Settlement Statement dated June 30, 1999. (Ex. D–4; Tr. at 23). She testified that she signed the second page of the Balloon Note, but claimed she signed it without ever seeing the first page, which contains the repayment terms, or the third page addendum, which sets forth a prepayment penalty. (Ex. P–1; Tr. at 56–57). She did not receive copies of any of the signed documents on June 30, 1999, but received copies later, when Vince returned with checks for her. (Tr. at 20, 55).

The Truth–in–Lending Disclosure Statement provides that the Debtor's payment schedule for the loan consisted of 179 payments of $599.84 each starting August 4, 1999 and one final payment of $53,960.54 on July 4, 2014. (Ex. D–1).

After June 30, 1999, Vince sent Steven Sacks to the Debtor's home to perform the home repairs. (Tr. at 30). The Debtor never entered into a written contract with the contractor. (Tr. at 11). The parties relied upon the written description and estimate prepared by Vince. (*Id.*). Mr. Sacks' workers performed home repair services for about three or four weeks, but the Debtor called Vince constantly during that time to complain about the poor quality of the work being done. (*Id.*). The Debtor offered into evidence photographs of the problems caused by the workers (Exs.D–12(a) to D–12(j), Tr. at 32–36).

A few weeks after June 30, 1999, Vince returned to the Debtor's house to give her four checks (Ex. D–4A; Tr. at 25). The first check, no. 6858, in the amount of $1,800 was used to make her first three loan payments. (Tr. at 38). The Debtor testified that when Vince brought her the checks representing the cash proceeds, she saw the statement from Parkway indicating that the monthly payment was $599 and told Vince it was more than what she had agreed to pay. (Tr. at 54–55). Vince told the Debtor that he had put aside $1,800 for the first three months of payments on the Parkway loan and, after she made those "good faith" payments, he assured her that he would find another loan to replace the Parkway loan that had a lower monthly payment. (Tr. at 17–18, 54–56).

The second check, no. 6859, in the amount of $8,000, was for the home improvement work. (Tr. at 38). The Debtor testified that the signature that appears on the back of check no. 6859, above the

signature of the contractor, is not hers. (*Id.*). The third check, no. 6860, in the amount of $251, was used to pay for insurance. (Tr. at 39–40; Ex. P–5). The fourth check, no. 6861, in the amount of $3,726.53, represented the cash proceeds that the Debtor received and deposited into her account, along with the check for $1,800. (Tr. at 40, 76–77).

The Debtor made 15 monthly payments to Parkway. (Tr. at 44). On January 12, 2001, the Debtor's counsel sent a letter to Parkway electing to rescind the loan transaction pursuant to TILA. (JPS, ¶ II.2; Ex. D–5). Parkway's counsel responded by letter dated February 12, 2001, disputing the Debtor's right to rescind. (JPS, ¶ II.3; Ex. D–6). On March 27, 2001, the Debtor filed a voluntary petition under chapter 13 of the United States Bankruptcy Code. The Debtor commenced this adversary proceeding on May 30, 2001. On or about July 12, 2002, Key Home Equity Service, Parkway's assignee, filed a proof of claim in the Debtor's bankruptcy case in the amount of $66,783.04. (Ex. D–7).

### DISCUSSION

1. ***Count I—Violations of HOEPA and TILA.***

In Count I of the Amended Complaint, the Debtor claims that the subject loan transaction was a closed-end consumer financing transaction within the scope of HOEPA and TILA, and that she was not provided with the disclosures required by the statutes. (Compl.¶¶ 22–23). As a result, the Debtor claims that she is entitled to rescind the loan. (*Id.*).

■ In 1968, Congress enacted TILA to govern the terms and conditions of consumer credit by requiring lenders to dis-

close certain details about loan fees and costs. *In re Crisomia*, 2002 WL 31202722, at *3 (Bankr.E.D.Pa. Sept.13, 2002). Congress intended TILA to assure a meaningful disclosure of credit terms so consumers are not misled about the costs of financing. *Id.* To that end, TILA, which is implemented by "Regulation Z," 12 C.F.R. Part 226,[6] "requires creditors to disclose the cost of credit as a dollar amount" (the "finance charge") and as an annual percentage rate (the "APR"). Uniformity in creditors' disclosures is intended to assist consumers in comparison shopping. TILA requires additional disclosure for loans secured by a consumer's home and permits consumers to rescind certain transaction that involve their principal dwelling." Truth in Lending, 61 Fed.Reg. 49237, 49237–38 (September 19, 1996).

■ HOEPA is an amendment to TILA, enacted in 1994, that requires lenders to make additional disclosures beyond those that are required by TILA for certain high cost mortgages ("HOEPA Disclosures"). 15 U.S.C. § 1639; *Cooper v. First Gov't Mortgage & Investors Corp.*, 238 F.Supp.2d 50, 54 (D.D.C. Nov.4, 2002). *See also Crisomia*, 2002 WL 31202722, at *3.

A. ***This loan transaction is not subject to the provisions of HOEPA.***

■ HOEPA Disclosures apply to mortgages described in 15 U.S.C. § 1602(aa). 15 U.S.C. § 1639. Section 1602(aa) provides, in pertinent part, as follows:

(1) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse

---

**6.** TILA vests the Board of Governors of the Federal Reserve System with the power to promulgate regulations for the interpretation

and implementation of the Act. *See* 15 U.S.C. § 1604(a).

mortgage transaction, or a transaction under an open end credit plan, if—

. . . .

 (B) the total points and fees payable by the consumer at or before closing will exceed the greater of—
 (i) 8 percent of the total loan amount; or
 (ii) $400.

15 U.S.C. § 1602(aa). The defendants in this case contend that this loan is not a HOEPA loan because the points and fees are less than 8% of the total loan amount. There are two steps in performing the HOEPA calculation: (1) determining the amount of "points and fees;" and (2) determining whether those points and fees exceed 8% of the total loan amount. *Cusato v. Option One Mortgage (In re Cusato),* Adv. No. 01–247, slip op. at 8 (Bankr. E.D.Pa. April 15, 2003).

 (i) *The points and fees calculation.*

"Points and fees" are defined in § 226.32(b)(1) of Regulation Z to include the following:

 (i) All items required to be disclosed under §§ 226.4(a) and 226.4(b) [i.e., the "finance charge"], except interest or the time-price differential;

 (ii) All compensation paid to mortgage brokers;

 (iii) All items listed in § 226.4(c)(7) [i.e., real-estate related fees] (other than amount held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge

is not paid to an affiliate of the creditor; and

 (iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1). *See also* 15 U.S.C. § 1602(aa)(4). The parties agree that the following charges are included in the points and fees calculation:

| | |
|---|---|
| Broker fee to Wharton | $3,840.00 |
| Application fee to Wharton | $ 350.00 |
| Underwriting fee to Parkway | $ 500.00 |
| Total | $4,690.00 |

(*See* Ex. D–8, ¶ 6). The Debtor, however, argues that the following charges which appear on the HUD–1 Settlement Sheet (Ex. D–4) also must be included in the points and fees calculation:

| | |
|---|---|
| Credit report fee—paid to Parkway | $ 7.50 |
| Flood Certification fee—paid to Parkway | $ 14.00 |
| Overnight mail fee—paid to Rittenhouse | $ 45.00 |
| Copying fee—paid to Rittenhouse | $ 30.00 |
| Recording service fee—paid to Rittenhouse | $ 30.00 |
| Title insurance endorsement fees—paid to Rittenhouse | $ 200.00 |
| Yield Spread Premium—paid by Parkway to Wharton | $1,280.00 |
| Hazard insurance premium—paid from the Debtor's cash proceeds for policy from Fair Plan 7 | $ 251.00 |

The first two charges on the above list are real estate related fees listed in § 226.4(c)(7) of Regulation Z,[8] which are

---

7. The hazard insurance premium does not appear on the HUD–1 Settlement Sheet, but was paid, by separate check, out of the cash proceeds paid to the Debtor. (*See* Exs. D–4A and P–5).

8. Regulation Z Section 226.4(c) provides, in pertinent part, as follows:

 (c) Charges excluded from the finance charge. The following charges are not finance charges:

 . . . .

 (7) Real-estate related fees. The following fees in a transaction secured by real property or in a residential mortgage

normally excluded from the finance charge, but will be included in a points and fees calculation if (1) the charges are not reasonable, (2) the lender receives—directly or indirectly—compensation from the charges, or (3) the charges are paid to the lender's affiliate. *See Crisomia*, 2002 WL 31202722 at *9. Although the credit report fee and the flood certification fee are reasonable in amount, the settlement sheet shows that they were paid to Parkway and, therefore, they must be included in the points and fees calculation.

■ Next, the Debtor argues that the points and fees calculation should include four items paid to the title company, Rittenhouse. The first item is an overnight mail fee of $45. At trial, Linda Groman, the president of Rittenhouse, testified that the fee was for overnight delivery of the loan package to the lender and overnight delivery of the payoff checks to the Debtor's two prior mortgagees to "reduce the amount of interest that was collected at the settlement and ... [to] guarantee and track the payment." (Tr. at 122). She also testified that the actual cost of the three deliveries was probably more than $45, and that the fee was $10 less than her usual overnight delivery charge. (Tr. at 122–23). The overnight delivery fee should be included in the points and fees calculation only if it is required to be disclosed as a finance charge (12 C.F.R. § 226.32(b)(1)(i)) or it is a real estate related fee that is not reasonable or was paid to the lender or affiliate of the lender (12

C.F.R. § 226.32(b)(1)(iii)). This charge does not fall within either category.

Other courts have held that an overnight mail fee that was incurred to expedite payoff checks to other creditors should not be included as a "finance charge" when there was no evidence indicating that the fee was imposed by the lender as incidental to the extension of credit. *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 579 (11th Cir.1996); *Great Western Bank v. Shoemaker*, 695 So.2d 805, 807 (Fla.Dist.Ct. App.1997). *See also Martinez v. Weyerhaeuser Mortgage Co.*, 959 F.Supp. 1511, 1517 (S.D.Fla.1996) *citing* Official Staff Commentary, 12 C.F.R. Pt. 226, Supp. I, § 226.4(a)(3) ("[P]ursuant to the Board's staff commentary, fees imposed by third parties for services not required by the lender where the lender does not retain the fee, are excluded from the TILA definition of a finance charge.").

Moreover, to the extent the overnight mail fee could be deemed to be a real estate related fee incurred for title insurance purposes under 12 C.F.R. § 226.4(c)(7)(i), Groman's testimony showed that the fee was reasonable, was less than the amount she usually charged and not paid to Parkway. Therefore, the overnight delivery fee should not be included in the points and fees calculation. *See Brannam v. Huntington Mortgage Co.*, 287 F.3d 601, 606 (6th Cir.2002) *citing In re Grigsby*, 119 B.R. 479, 488 (Bankr. E.D.Pa.1990) *vacated on other grounds by*

---

transaction, if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii) Notary and credit report fees.

(iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

12 C.F.R. § 226.4.

127 B.R. 759 (E.D.Pa.1991)(A fee should be considered reasonable if it was for a service actually performed and reasonable in comparison to the prevailing practices of the industry in the relevant market.)

■ The second fee paid to Rittenhouse was a copying fee in the amount of $30.00. Groman testified that the copying fee was based on the estimated cost for copying the loan documents that were faxed to her office by the lender. (Tr. at 123, 138–39). She testified that she ordinarily charged such a copy fee in her closings at that time. (Tr. at 123). Parkway contends that the fee should not be included in the points and fees calculation because it is a reasonable real estate related fee, not paid to Parkway, incurred for preparing loan-related documents. 12 C.F.R. § 226.4(c)(7)(ii), § 226.32(b)(1)(iii). The Debtor, however, argues that the copying fee is not "bona fide" because it was based on an estimate, not actual number of copies, and is not reasonable because it is a charge that should have been absorbed by the title company as overhead.

I do not agree that the copying fee is a real estate related fee incurred for *preparing* loan documents. Therefore, it is not subject to the test for including § 226.4(c)(7)(ii) fees in the definition of points and fees. Instead, it is a charge by the closing agent. The Official Staff Commentary discusses whether such fees should be disclosed as part of the finance charge as follows:

(4)(a)(2) Special rule; closing agent charges.

(i) General. This rule applies to charges by a third party serving as the closing agent for the particular loan. An example of a closing agent charge included in the finance charge is a courier fee where the creditor requires the use of a courier.

(ii) Required closing agent. If the creditor requires the use of a closing agent, fees charged by the closing agent are included in the finance charge only if the creditor requires the particular service, requires the imposition of the charge, or retains a portion of the charge. Fees charged by a third-party closing agent may be otherwise excluded from the finance charge under § 226.4. For example, a fee that would be paid in a comparable cash transaction may be excluded under § 226.4(a).

12 C.F.R. Pt. 226, Supp. I, § 226.4(a)(2). There was no evidence that indicated that the copying fee was required by Parkway or that Parkway retained a portion of the fee. Accordingly, the copying fee should not be included in the points and fees calculation.

■ The third fee paid to Rittenhouse is listed as a recording service fee in the amount of $30. Groman testified that this fee was charged to offset the cost of hiring a courier to deliver the documents to the Recorder of Deeds office to record the new mortgage lien and to release the two existing mortgage liens. (Tr. at 123–125). Rittenhouse charged a recording service fee on all transactions during that time period. (Tr. at 124). Based upon the Official Staff Commentary cited above regarding closing agent costs, and for the same reasons stated above with respect to the copying charge, I conclude that the recording service fee should not be included in the fees and points calculation.

■ The final fee paid to Rittenhouse that is in dispute is the title insurance endorsement fee in the amount of $200. Groman testified that this fee included was for "the endorsements to the title policy issued to the lender, which are pretty customary and required by the lender. They are additional affirmative coverages in ad-

dition to the insurance that they have a first-lien position." (Tr. at 121). The cost of the endorsements are set by the Department of Insurance and Groman testified that she had no discretion to change the amount charged. (*Id.*). Clearly, these are real estate related fees for title insurance and fall within 12 C.F.R. § 226.4(c)(7)(i). Therefore, they are only included in the points and fees calculation if the charges are not reasonable or were paid to Parkway or its affiliate. 12 C.F.R. § 226.32(b)(1)(iii). I conclude that the title endorsement fees are reasonable and were paid to Rittenhouse. *See Cusato, supra.*, slip op. at 15. Therefore, they will not be included in the points and fees calculation.

 The Debtor also argues that the Yield Spread Premium in the amount of $1,280 should be included in the points and fees calculation. The HUD-1 Settlement Sheet shows that Yield Spread Premium was not included in the column of amounts "paid from the borrower's funds at settlement," but instead was paid by the lender to Wharton Investment. (*See* Ex. D-4).[9] The statute that describes which mortgage transactions are subject to HOEPA states that it applies to certain mortgage transactions when "the total points and fees *payable by the consumer at or before closing* exceed the greater of—(i) 8 percent of the total loan amount; or (ii) $400." 15 U.S.C. § 1602(aa)(emphasis added). The Official Staff Commentary to § 226.32 of Regulation Z provides that:

> In determining "points and fees" for purposes of this section, compensation paid by a consumer to a mortgage broker (directly or through the creditor for delivery to the broker) is included in the

calculation whether or not the amount is disclosed as a finance charge. *Mortgage broker fees that are not paid by the consumer are not included.*

Official Staff Commentary, 12 C.F.R. Part 226, Supp.I, § 226.32(b)(1)(ii). In *Noel v. Fleet Finance, Inc.,* the court held that a yield spread premium is a finance charge under TILA, but it is not a prepaid finance charge paid by the borrowers at or before consummation of the transaction that needs to be separately itemized; rather, it is paid indirectly by the borrower over the course of the loan in the form of a higher interest rate. *Noel,* 971 F.Supp. at 1110–1112. Even if the yield spread premium in this case is part of the finance charge, it clearly was not paid by the Debtor at or before closing. Therefore, the yield spread premium is not included in the points and fees calculation.

 The final item which the Debtor argues must be included in the points and fees calculation is the $251 premium for a property insurance policy that did not appear on the settlement sheet, but was paid for with the Debtor's cash proceeds. (*See* Ex. D-4A, Ex. P-5). Parkway argues that the insurance premium should not be included in the points and fees calculation because it did not require the Debtor to incur this cost and had no control over the Debtor's use of her cash proceeds. The Debtor, however, argues that she already had insurance on the Property, yet was told by Vince that she needed to obtain this policy. (Tr. at 39).

The Debtor's testimony about whether she already had property insurance in

9. A Yield Spread Premium is a bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan. The lender then rewards the broker by paying it a percentage of the "yield spread" (i.e., the difference between the interest rate specified by the lender and the actual interest rate set by the broker at the time of origination) multiplied by the amount of the loan. *Noel v. Fleet Finance, Inc.,* 971 F.Supp. 1102, 1106–07 (E.D.Mich.1997).

**154**

place at the time of the loan closing and whether she signed the insurance application on July 6, 1999 is confused. (Tr. at 67–73, 75–76). I do not find the Debtor's testimony that her signature was forged on the insurance application to be credible. However, I do find credible that she believed she was required to purchase insurance with her cash proceeds, as directed by Vince, and she was not given a copy of the policy or an explanation about the type of insurance she was buying. (Tr. at 39).

The issue at present is whether the insurance cost must be included in the points and fees calculation as a "finance charge." 12 C.F.R. § 226.32(b)(1). TILA provides that:

> Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person to whom the credit is extended, setting forth the cost of the insurance if obtained from or through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

15 U.S.C. § 1605(c). *See also* 12 C.F.R. § 226.4(d)(2)(ii). Even assuming that Vince wrongfully required the Debtor to buy the property insurance at issue (i.e., if she already had valid insurance), the Truth–In–Lending Disclosure Statement contained adequate disclosures regarding her obligation to purchase hazard insur-

ance and advising that she could obtain insurance through any person of her choice. (Ex. D–1) Further, the evidence indicates that she purchased the insurance through Vince, not Parkway. Therefore, pursuant to the sections of TILA and Regulation Z quoted above, the insurance premium should not be included in the points and fees calculation.

Based on the foregoing, the total points and fees for this loan transaction are:

| $4,690.00 | (as agreed by the parties) |
| $ 7.50 | (credit report fee paid to Parkway) |
| $ 14.00 | (flood certification fee paid to Parkway) |
| $4,711.50 | Total |

**(ii) _Determining whether the "points and fees" exceed 8% of the total loan amount._**

■ After calculating the points and fees, the second prong of the HOEPA threshold test set forth in 15 U.S.C. § 1602(aa)(1)(B) requires a determination of whether the "total points and fees payable by the consumer at or before closing will exceed ... 8 percent of the total loan amount." 15 U.S.C. § 1602(aa)(1)(B). The Official Staff Commentary to Regulation Z provides that "the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b),[10] and deducting any cost listed in § 226.32(b)(1)(iii) [i.e., the real estate related fees] and § 226.32(b)(1)(iv)[i.e., premiums for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage] that is both included as points and fees under § 226.32(b)(1) and financed by the creditor." Official Staff Commentary, 12 C.F.R. Pt. 226, Supp. I, § 226.32(a)(1)(ii). The amount financed in

**10.** 12 C.F.R. § 226.18(b) provides that the "amount financed" is calculated by (1) determining the principal loan amount or cash price (subtracting any downpayment); (2) adding any other amounts that are financed by the creditor and are not part of the finance charge; and (3) subtracting any prepaid fi-

nance charge. The term "prepaid finance charge" is defined in 12 C.F.R. § 226.2(a)(23) as meaning: "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time."

this loan transaction is $59,310.[11] After subtracting the additional points and fees under § 226.32(b)(1)(iii)[$21.50] and § 226.32(b)(1)(iv)[$0], the "total loan amount" for this loan transaction is $59,288.50.

Eight percent of the total loan amount is $4,743.08. Because the points and fees in the amount of $4,711.50 is less than $4,743.08, this loan transaction does not fall within HOEPA.

### B. *The loan transaction violates TILA because the Debtor did not receive proper notice of her right to rescind.*

 In paragraph 23 of the Amended Complaint, the Debtor contends that she is entitled to rescind the loan transaction because, among other things, she was not provided with notice of her right to cancel the transaction at closing.[12] TILA requires a creditor to provide a borrower with clear and conspicuous notice of her right to rescind in accordance with the provisions of 15 U.S.C. § 1635(a). Section 226.23(b) of Regulation Z more specifically states:

> (b)(1) **Notice of right to rescind.** In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind. . . . The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
> (i) The retention or acquisition of a security interest in the consumer's principal dwelling.
> (ii) The consumer's right to rescind the transaction.
> (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
> (iv) The effects of rescission, as described in paragraph (d) of this section.

12 C.F.R. § 226.23(b)(1). This requirement is not a "mere technicality," because "[e]ffective exercise of the right to rescind obviously depends upon the delivery of one copy of the rescission form to the creditor and the retention by the obligor of the other copy." *Williams v. BankOne, N.A. (In re Williams)*, 291 B.R. 636, 645 (Bankr.E.D.Pa.2003) *quoting Stone v. Mehlberg*, 728 F.Supp. 1341, 1353 (W.D.Mich.1989).

 The Notice of Right to Cancel signed by the Debtor contains an acknowl-

---

**11.** The "amount financed" pursuant to § 226.18(b) is $59,310, which is calculated by taking the principal amount of the loan ($64,000) plus any other amounts financed that are not included in the finance charge ($0) less the prepaid finance charges ($4690).

**12.** Parkway argues that the Debtor admitted in paragraph 10 of the Amended Complaint that she received loan documents, including her Truth–in–Lending Disclosure Statement, at closing. Parkway further argues that the Debtor raised the issue of whether she received her Right To Cancel Notice for the first time at trial. However, paragraph 23 of the Debtor's complaint includes an allegation that she did not receive a notice of rescission at closing. A statement in the Debtor's complaint alleging that she received a Truth–in–Lending Disclosure Statement at closing is not an admission that she received all necessary documents at closing. More importantly, the first paragraph under "Legal Issues Presented" in the Joint Pre-trial Statement states: "Did the Debtor receive the requisite Notice of Right to Cancel form at settlement?" JPS, ¶ V(1), p. 4. Clearly, Parkway had notice of this issue prior to trial. Moreover, the Pretrial Order dated January 15, 2003, provides that the JPS "shall govern the conduct of the trial and shall supersede all prior pleadings in the case." Pretrial Order, ¶ 6.

edgment of receipt preprinted above her signature. (Ex. D–2). However, the written acknowledgment "does no more than create a rebuttable presumption of delivery" of the documents. 15 U.S.C. § 1635(c). To determine whether the Debtor timely received the Notice of Right to Cancel, I must examine the testimony regarding the closing.

At trial, the Debtor testified that she signed loan documents that were brought to her house by Vince (Tr. at 13), that some of the documents were not completely filled out (Tr. at 19), that she did not date the documents that she signed (Tr. at 19, 20, 21, 23), and that she was not given copies of the loan documents at the time she signed them (Tr. at 20). As Vince flipped through the papers and briefly explained them, she signed them without stopping him to ask questions because she trusted him. (Tr. at 60–63). She also testified that only she and Vince were present at the signing. (Tr. at 13). It appears that Vince provided her with copies of the loan documents when he returned to her house sometime around July 6 or 7, 1999 with the checks representing the settlement proceeds. (*See* Tr. at 55). Upon reviewing the loan documents at trial, the Debtor claimed that her signature was forged on a number of documents. (Tr. at 57, 61–62, 64, 67).

Conversely, Groman testified that the loan documents could not have been blank at the time of signing because the loan documents were generated by the lender and faxed to Rittenhouse. (Tr. at 117–19). Groman reviewed the documents, prepared the settlement statement, and copied the documents to make two additional sets for the loan closing. (*Id.*). Although she had known Vince Corelli for only a short time and it was not her usual practice, she agreed to allow Vince to take the loan documents to the borrower's home for sig-

nature. (Tr. at 132–33). She was assured that he would have a notary present at the closing. (Tr. at 132). Groman copied a set of documents for the Debtor, but she testified that she really has no way of knowing whether Vince left a copy of the loan documents with the Debtor at closing. (Tr. at 134–35).

Although the Debtor claimed to be positive that many of the documents she signed were blank, I find Gorman's testimony—that she reviewed the documents upon receipt from the lender and found them to be complete—to be more convincing. Based upon the Debtor's testimony that she was signing documents as Vince flipped through them, it is more likely that the Debtor did not review the loan documents carefully. I also find, however, that the Debtor's testimony that Vince had her sign the documents quickly and then left without giving her copies to be credible and consistent with the remaining facts. Vince apparently took the loan documents with him and had them notarized and dated at another time and location. This prevented the Debtor from having the opportunity to examine the loan documents in more detail on her own and, if she so chose, to take advantage of her right to rescind the transaction upon learning of the inconsistencies between the loan she believed she was getting and the loan she was actually given.

Because I find that the Debtor testified credibly that she was not given copies of the loan documents, including the Notice of Right to Cancel, at closing, she has rebutted the presumption of delivery on the Notice of Right to Cancel. *Williams v. Gelt Fin. Corp.*, 237 B.R. 590, 594–95 (E.D.Pa.1999)("This presumption may be rebutted by the 'testimony of a debtor' that the disclosures were not given, 'even where a disclosure statement is produced.' ") *citing Pinder v. Lomas & Net-*

*tleton Co.,* 83 B.R. 905, 913 (Bankr.E.D.Pa. 1988); *Hanlin v. Ohio Builders & Remodelers, Inc.,* 212 F.Supp.2d 752, 762 (S.D.Ohio 2002)(plaintiffs' testimony that they did not receive disclosures sufficient to rebut presumption).

The burden of proof regarding proper delivery now shifts to Parkway. *Williams,* 237 B.R. 590, 595 ("Once the debtor has provided an affidavit or testimony that he or she did not receive the documents, it is incumbent upon the ... [creditor] to produce some positive evidence that delivery of the documents occurred." (citation omitted)). Groman admitted that she did not know whether Vince provided the Debtor with copies of the loan documents as required by TILA. Because no further evidence on delivery of the documents has been submitted, I find that the Debtor did not receive copies of the loan documents, particularly a copy of the Notice of Right to Cancel, at closing in violation of 15 U.S.C. § 1635(a) and 12 C.F.R. § 226.23(b)(1).

 Presumably, the Debtor eventually received a copy of the Notice of Right to Cancel when Vince delivered the checks to her on July 6 or 7, 1999.[13] However, by this time, the dates in the Notice of Right to Cancel were meaningless, since the Notice stated that the deadline for exercising her right to rescind was midnight on July 3, 1999. Regulation Z provides:

> The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph

(b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

12 C.F.R. § 226.23(a)(3). *See also* 15 U.S.C. § 1635(f). Other courts have held that a failure to fill in the expiration date on a rescission form is a violation of TILA and, although it is a "purely technical violation of TILA," it enables the borrower to rescind the loan for up to three years. *Armstrong v. Nationwide Mortgage Plan/Trust (In re Armstrong),* 288 B.R. 404, 413–14 (Bankr.E.D.Pa.2003) *citing Semar v. Platte Valley Fed. S & L,* 791 F.2d 699, 704 (9th Cir.1986); *Williamson v. Lafferty,* 698 F.2d 767, 768–69 (5th Cir.1983); *Mayfield v. Vanguard S & L Ass'n,* 710 F.Supp. 143, 146 (E.D.Pa.1989); *Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 507 (E.D.Pa.1985). Similarly, notice of an incorrect date does not provide "clear and conspicuous" notice to the borrower of the date on which the rescission period expires, as required by 12 C.F.R. § 226.23(b)(1). *See Taylor v. Domestic Remodeling, Inc.,* 97 F.3d 96, 98–99 (5th Cir.1996)(holding that a misdated notice of right to rescind and disbursement of the loan proceeds prior to compliance with TILA resulted in a material failure to disclose the right to rescind to the borrowers and, therefore, the borrowers were entitled to a three-year rescission period pursuant to 15 U.S.C. § 1635(f)).[14]

---

**13.** The record does not reveal whether the Debtor eventually received one or two copies of the Notice of Right to Cancel. Section 226.23(b)(1) states that the lender must provide the Debtor with *two* copies of the notice. The Debtor did not raise the number of copies received as an issue. Because I conclude below that the copy received violated TILA, I need not determine whether the Debtor received the appropriate number of copies.

**14.** As was discussed by the Fifth Circuit Court of Appeals in *Taylor,* both this case and *Taylor* can be distinguished from *Smith v. Fidelity*

Here, the Debtor did not receive proper disclosure of her right to cancel. This violation of the right to rescind disclosure requirements extends the Debtor's rescission period for this transaction to three years. 12 C.F.R. § 226.23(a)(3). On January 12, 2001, the Debtor sent Parkway a letter notifying it of her intent to rescind the loan transaction, which, indisputably, was within the three-year rescission period.

### 2. Count II—Failure to obtain a proper notary on the Mortgage.

In the Amended Complaint, and the Joint Pre–Trial Statement, the Debtor argues that she may avoid the Mortgage against her Property under Bankruptcy Code § 544(a)(3) due to the improper notarization of the Mortgage because the notary was not present at closing and because "the entire transaction was rife with forgery, fraud, and overreaching." Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 13.

 Pennsylvania law require that all deeds and conveyances made and executed within Pennsylvania be acknowledged, otherwise the deed or conveyance is adjudged fraudulent and void against any subsequent purchaser or mortgagee. 21 P.S. § 444. Under Pennsylvania law, a recorded mortgage containing an acknowledgment that is complete and proper on its face cannot be avoided unless there is proof of fraud or forgery. *Jones v. The Money Store, Inc. (In re Jones)* 284 B.R. 92, 96 (Bankr.E.D.Pa.2002) *aff'd* 308 B.R. 223 (E.D.Pa.2003). *See also Armstrong*, 288 B.R. at 430; *Schwab v. Home Loan*

*and Investment Bank (In re Messinger)*, 281 B.R. 568 (Bankr.M.D.Pa.2002). As I discussed in *Jones*, the rationale behind the foregoing decisions is as follows:

Under Pennsylvania law, the acknowledgment does not affect the validity of the mortgage and is not part of the document. *Messinger*, 281 B.R. at 574. The acknowledgment is required for the recording and perfection of a mortgage lien. *Messinger*, 281 B.R. at 573 *citing Abraham v. Mihalich*, 330 Pa.Super. 378, 381, 479 A.2d 601, 603 (1984) and 21 P.S. § 42. The purpose of the acknowledgment is to verify the executing party's identity and voluntary intention to be bound by the terms of the document. *Messinger*, 281 B.R. at 574.

. . . .

[T]he [*Messinger*] Court concluded that, in the absence of any allegation of fraud or forgery, the latent defect did not warrant "interference with the presumptive validity of acknowledged and recorded mortgages, facially complete and regular.". . . In support of this conclusion, the Court wrote:

The official certificate of the notary, in regular form, is (in the absence of fraud or forgery) conclusive in favor of those who in good faith rely upon it. "Any other rule would work incalculable mischief. It would open wide the door to fraud and perjury, and make recorded acknowledgments a snare to a person dealing with land on the faith and credit of the public records." *Popovitch v. Kasperlik*, 70 F.Supp. 376, 384 (W.D.Pa.1947). Allowing a chal-

*Consumer Discount Co.*, 898 F.2d 896 (3d Cir.1990), in which the Third Circuit Court of Appeals found that delivery of the loan proceeds during the rescission period in violation of 12 C.F.R. § 226.23(c) was not a violation of the disclosure requirements of 12 C.F.R. § 226.23(b). The Third Circuit decided that

only a violation of the disclosure requirements of § 226.23(b) extended the rescission period. *Smith*, 898 F.2d at 904. The incorrect date on the Notice of Right to Cancel is a disclosure violation of § 226.23(b), thereby entitling the Debtor to a three-year rescission period.

lenge where there is an allegation of fraud or forgery would restore the protections that may have been lost by an improper fulfillment of notarial duties. Where the grantors concede that they have signed the deed, and the deed had been delivered, "even a defective acknowledgment would not be a basis for invalidating the recordation." *Abraham v. Mihalich*, 330 Pa.Super. at 382, 479 A.2d at 603. *Jones*, 284 B.R. at 95–96, *quoting Messinger*, 281 B.R. at 574–75.

■ I have determined that the contractor/notary, Steven Sacks, was not present at the closing on June 30, 1999. (*See* Tr. at 22–23). However, the Debtor testified that she signed the Mortgage (*see* Tr. at 20–21) and, therefore, the fact that it was not notarized in the Debtor's presence is not sufficient, on its own, to avoid the mortgage under 11 U.S.C. § 544. However, her allegations of forgery, fraud and overreaching require me to review the loan transaction more closely to determine whether the Debtor voluntarily agreed to be bound by the terms of the Mortgage.

First, the Debtor may attack the validity of the acknowledgment by alleging that the underlying document was forged. *See Steel v. Snyder*, 295 Pa. 120, 128, 144 A. 912, 915 (1929)("If the mortgage was a forgery, its purported acknowledgment was false and fraudulent and gave the instrument no legal validity.") Here, the Debtor testified that some documents, other than the Mortgage, were forged. *See, e.g.,* Tr. at 23 (Debtor claims she did not sign the HUD–1 Settlement Sheet); Tr. at 56–57 (Debtor claims she did not sign all pages of the Balloon Note); and Tr. at 38 (Debtor claims she did not sign check no. 6859, in the amount of $8,000). This does not provide a basis for finding that the Mortgage was forged and rendering the acknowledgment invalid.

Although she does not specify the fraudulent conduct that she believes entitles her to avoid the mortgage under Count II, the Debtor has argued throughout this proceeding that the documents she signed contained blanks, some of the documents were forged, the monthly payments were more than what she previously agreed to with Vince, and she was not made aware of the fact that the loan included a balloon payment.

■ To prove fraud, the Debtor must show "a material misrepresentation made with knowledge of its falsity or reckless disregard for its truth and with the intent of misleading another into relying upon it; justifiable reliance on the misrepresentation; and, a resulting injury proximately caused by the misrepresentation." *Giangreco v. United States Life Insurance Co.*, 168 F.Supp.2d 417, 423 (E.D.Pa.2001). For the reasons set forth below, I conclude that the Debtor has not provided clear and convincing evidence of fraud. *See Barker v. Altegra Credit Co. (In re Barker)*, 251 B.R. 250, 258 (Bankr.E.D.Pa.2000) (To establish a valid fraud claim, the plaintiff must prove the elements of fraud by the exacting standard of clear and convincing evidence). *See also Gordon Investments, Inc. v. Gillingham (In re Gillingham)*, 143 B.R. 55, 61–62 (Bankr.W.D.Pa.1992).

As discussed previously, I do not find the Debtor's testimony regarding the blanks in the documents to be credible. Similarly, her testimony that many documents "appear to be her signature" but are probably forged is not credible.[15] Instead, I conclude that the Debtor did not

---

**15.** I do, however, find credible her testimony of forgery regarding check no. 6859, in the amount of $8,000. A review of that exhibit shows that the signature is clearly not similar to the Debtor's signature on other documents.

review carefully the loan documents as she was signing them on June 30, 1999. Because she relied upon Vince to tell her what and where to sign, she cannot testify accurately whether the documents were completed or whether she signed particular documents and pages of documents on that evening.

▮ The Debtor did not provide clear and convincing evidence that Vince overtly misrepresented the loan's terms, specifically, the higher monthly payment and the balloon feature, at the time she signed the documents. She testified only that she was not aware of the higher monthly payments until after closing. However, "fraud may also arise from the intentional concealment of material facts which is calculated to deceive the other party and which the withholding party has a duty to disclose." *Giangreco*, 168 F.Supp.2d at 423 n. 5. *See also Rodriguez v. Mellon Bank, N.A. (In re Rodriguez)*, 218 B.R. 764, 784 (Bankr.E.D.Pa. 1998)(When a party is under a legal duty to make a disclosure, the mere nondisclosure of information can constitute a misrepresentation). Under TILA, the lender has a duty to provide written disclosures regarding the payments due under the loan. 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 226.18(g). The Debtor has admitted throughout this proceeding that she signed the Federal Truth–in–Lending Disclosure Statement (Ex. D–1). The TILA Disclosure Statement stated both the amount of the monthly payments and the balloon payment.

▮ The Debtor chose to rely upon Vince rather than read the documents which contained the required disclosures. Under Pennsylvania law, failure to read—without additional proof of misrepresentations—is not sufficient to prove fraud, because "[i]t is the responsibility of the executing party to understand the significance of the documents he or she is signing. 'Pennsylvania law affords no leniency for individuals who do not read the contracts that they execute.' According to the Pennsylvania Supreme Court, 'in the absence of proof of fraud, failure to read is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.'" *In re Jones*, 284 B.R. at 96, n. 5 *quoting Nelson Medical Group v. Phoenix Health Corp.*, 2002 WL 1066959, *2 (Pa.Com.Pl.2002), *citing In re Estate of Olson*, 447 Pa. 483, 488, 291 A.2d 95, 97 (1972). There is no evidence that the Debtor was incapable of reading and understanding the basic terms of the loan documents.

Accordingly, I conclude that the Debtor cannot avoid the loan transaction under 11 U.S.C. § 544.

### 3. *Count III—Violations by the Broker.*

In Count III of Amended Complaint, the Debtor contends that Wharton engaged in common law fraud, breached its fiduciary duties to the Debtor, and violated the Pennsylvania Credit Services Act, 73 P.S. § 2181 *et seq.*[16] The loan documentation

**16.** Wharton argues that the Debtor should not be permitted to maintain her causes of action under the Credit Services Act because she claimed a violation of 73 P.S. § 2188(c)(2) in her Amended Complaint. Subsection 2188(c)(2) pertains to restrictions on loan brokers and Wharton, as a licensed mortgage broker (Tr. at 149–50), is excepted from the

definition of a loan broker pursuant to 73 P.S. § 2182. However, in the JPS, the Debtor expanded her allegations against Wharton to include claims under the Credit Services Act generally. Therefore, I conclude that Wharton had notice prior to trial of the Debtor's claims under the Credit Services Act generally, is bound by the terms of the JPS, and is

for this transaction included a "Borrowers Acknowledgment of Services Provided By Broker" and a "Mortgage Loan Origination Agreement" dated June 30, 1999 and signed by the Debtor. (Ex. D–6, pp. 7–8).[17] The Acknowledgment stated that the broker's compensation would be $5,470.00 and included a statement of services to be provided by the Broker.[18] Despite this documentation, the Debtor testified that she never spoke to or interacted with anyone from Wharton and that Vince was her sole contact in connection with this loan. (Tr. at 11–12). Flacco testified that he mailed a loan application package to the Debtor (Tr. at 156) and "processed" the loan for the lender.[19] However, he did not provide any evidence of contacts with the Debtor, either through the mail or by telephone (Tr. at pp. 170–71), and admitted that he may not have spoken to the Debtor directly. (Tr. at 171).

 Count III of the Debtor's Amended Complaint mirrors the relief granted to the borrower in the *Barker* case. *See Barker*, 251 B.R. 250. However, unlike the borrower in *Barker*, the Debtor in the case at bar had little or no direct interaction with Wharton regarding this loan transaction. Because the Debtor's evidence does not set forth any material misrepresentations by Wharton upon which she relied, her claim based on com-

mon law fraud must be denied. *See Giangreco*, 168 F.Supp.2d at 423. Moreover, the Debtor has not provided any evidence to establish a confidential relationship between the Debtor and Wharton, so her claims for breach of fiduciary duty also must be denied. *See Barker*, 251 B.R. at 257–59; *Koch v. First Union Corp.*, 2002 WL 372939, at *7–*8 (Pa.Com.Pl. Jan. 10, 2002).

The Borrower's Acknowledgment states that Wharton has "assisted the Borrower in securing the . . . financing" by providing specific services, including those Wharton admits to performing, such as completing the credit application, gathering required income and mortgage history documentation to submit with the application, arranging for an appraisal of the home, and obtaining lender approval. The Debtor argues that Wharton is a "credit services organization" which is defined in § 2182 of the Credit Services Act as follows:

**"Credit services organization."**

A person who, with respect to the extension of credit by others, sells, provides or performs or represents that he or she can or will sell, provide or perform any of the following services in return for the payment of money or other valuable consideration:

---

not prejudiced by the Debtor's claims thereunder.

17. Stephen Flacco ("Flacco") of Wharton testified that he did not have a contract with the Debtor (Tr. at 172), he did not prepare any documents for the closing and he did not attend the closing (Tr. at 165–66). Therefore, I find that these documents must have been prepared by Parkway. For that reason, any liability based upon the documents will be awarded against Parkway and Wharton, jointly and severally.

18. There is also a "Mortgage Loan Origination Agreement" signed by the Debtor, on

which the name of the mortgage broker is left blank. (Ex. D–10, p. 13). It is unclear when this document was signed, but it appears to be part of the loan application package. Because it is blank, I do not give weight to the document.

19. Flacco testified that in "processing" the loan, his duties would include procuring information about the Debtor's job and documenting it with W–2's, paystubs, and other documents, and then providing the information to the lender so the lender can determine whether to extend a loan. (Tr. at p. 160).

(i) Improving a buyer's credit, record, history or rating.

(ii) Obtaining an extension of credit for a buyer.

(iii) Providing advice or assistance to a buyer with regard to either subparagraph (i) or (ii).

73 P.S. § 2182. An "extension of credit" is defined in 73 P.S. § 2182 as "[t]he right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family or household purposes." Subsection (2) of the definition of a credit services organization sets forth exceptions to the rule, but those exceptions do not apply here.

 Wharton argues that it is not a credit services organization because the loan in this matter was a mortgage loan transaction governed by the provisions of the Mortgage Bankers and Brokers and Consumer Equity Protection Act, 63 P.S. § 456.301 et seq. (the "Mortgage Act"). Neither party has cited to, nor has my research uncovered, any cases discussing whether transactions subject to the Mortgage Act can also be subject to the Credit Services Act. However, the Consumer Equity Protection chapter of the Mortgage Act sets forth limitations and restricted acts for "Covered Loans," which are defined in 63 P.S. § 456.503 to mean loans subject to HOEPA (i.e., mortgages that fall within the requirements of 15 U.S.C. § 1602(aa)) and for which the original principal balance of the loan is less than $100,000. Because I have already determined that this loan is not subject to HOEPA, this loan would not fall within the Mortgage Act and, at this time, I need not decide whether a loan can be subject to both the Mortgage Act and the Credit Services Act.

 By working to obtain an extension of credit for the Debtor in return for compensation, Wharton falls within the definition of a "credit services organization" and, therefore, must comply with the Credit Services Act. The Act requires a credit services organization to provide buyers with an information sheet about its services and fees prior to execution of a contract or prior to receipt of any money. 73 P.S. §§ 2184, 2185.[20] The Credit Services Act also requires a contract between a buyer and a credit services organization to include certain information, including notice of the buyer's right to cancel the contract within five days of signing. 73 P.S. § 2186. Attached to Wharton's answers to the Debtor's interrogatories is a copy of a "good faith estimate of charges" that is signed by the Debtor and dated April 28, 1999. (Ex. D-10, p. 16). The good faith estimate of charges includes an estimate of the fees to be paid to Wharton, but none of the documents (including the good faith estimate of charges, the Acknowledgment, or the Mortgage Loan Origination Agreement) include any of the disclosures required by 73 P.S. § 2185 or § 2186. The Credit Services Act provides for damages as follows:

Any buyer or borrower injured by a violation of this act or by the credit services organization's or loan broker's breach of a contract subject to this act may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer or borrower to the credit services organization or loan broker, plus reasonable attorney fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.

---

**20.** A "buyer" is defined in the Credit Services Act as "a natural person who is solicited to purchase or who purchases the services of a credit services organization." 73 P.S. § 2182.

73 P.S. § 2191. The testimony in this case revealed that the Debtor did not understand that Wharton was involved in this loan transaction or that the agreement with Wharton was subject to cancellation. Pursuant to the provisions of the Credit Services Act, I conclude that the Debtor is entitled to damages in the amount she paid to Wharton. The HUD–1 Settlement Sheet shows that Wharton was paid a broker fee of $3,840 and an application fee of $350 from the Borrower's loan proceeds, or a total of $4,190.00. Wharton was also paid a yield spread premium of $1,280 by the lender at settlement. The yield spread premium is paid indirectly by the Debtor in the form of a higher interest rate. *Noel,* 971 F.Supp. at 1110–11. Therefore, I conclude that the damages should also include the yield spread premium payment to Wharton, for total damages in the amount of $5,470.

### 4. *Count IV—HIFA Violations.*

In Count IV of the Amended Complaint, the Debtor claims that the defendants acted in concert to avoid the strict requirements of the Pennsylvania Home Improvement Finance Act, 73 PS. § 500–101 *et seq.* ("HIFA") in structuring this loan, and performed deceptive acts that were calculated to confuse the borrower in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* ("CPL"). More specifically, assuming the loan transaction is subject to

HIFA, the Debtor alleges that she can raise breach of warranty defenses against Parkway and may recover damages under the CPL for violations of HIFA requirements.[21] *See* JPS, ¶¶ 2, 3, 12, 13, and 14.

█ HIFA applies to "home improvement installment contracts," which are defined as follows:

> **"Home improvement installment contract"** or **"contract"** means an agreement covering a home improvement installment sale, whether contained in one or more documents, together with any accompanying promissory note or other evidence of indebtedness, to be performed in this Commonwealth pursuant to which the buyer promises to pay in installments all or any part of the time sale price or prices of goods and services, or services. The meaning of the term does not include such an agreement, if (i) it pertains to real property used for a commercial or business purpose; or (ii) it covers the sale of goods by a person who neither directly nor indirectly performs or arranges to perform any services in connection with the installation of or application of the goods; or (iii) it covers only an appliance designed to be freestanding and not built into and permanently affixed as an integral part of the structure such as a stove, freezer, refrigerator, air conditioner, other than one connected with a central heating system, hot water heater

---

21. HIFA does not provide a private litigant with a cause of action for a HIFA violation because the sole means of enforcement is through the State Attorney General or district attorney. *Armstrong,* 288 B.R. at 427 *citing Engle v. Shapert Constr. Co.,* 443 F.Supp. 1383 (M.D.Pa.1978). However, other courts have determined that a violation of HIFA qualifies as an unfair method of competition or an unfair or deceptive act or practice under the CPL, so that the plaintiff may look to the CPL for a remedy. *Armstrong,* 288 B.R.

at 427 *citing In re Russell,* 72 B.R. 855 (Bankr.E.D.Pa.1987). *Cf. Crisomia,* 2002 WL 31202722 at *12, n. 29.

The Debtor, citing *Brown v. Courtesy Consumer Discount Co. (In re Brown),* 134 B.R. 134 (Bankr.E.D.Pa.1991), also claims loan charges that are imposed in violation of HIFA constitute a TILA violation, enabling the Debtor to rescind the loan transaction. Because I have already concluded that the Debtor may rescind the loan under TILA, I need not decide this issue here.

and the like; or (iv) it covers the sale of goods and the furnishing of services or the furnishing of services thereunder for a cash price stated therein of three hundred dollars ($300) or less; (v) the loan is contracted for or obtained directly by the retail buyer from the lending institution, person or corporation; or (vi) the loan is insured, or a written commitment to insure it has been issued, pursuant to national housing legislation.

73 P.S. § 500–102(10). Parkway argues that the Loan is not subject to HIFA, because it was a mortgage refinancing and, although some of the cash proceeds were being used for home repairs, the purpose of the loan was not to finance home improvements. However, the original purpose of the Loan was to cover the cost of home improvement work.[22] (Tr. at 51). The loan transaction started when Vince solicited the Debtor and advised that he could provide a contractor and financing so that the Debtor could have home improvement work performed on her residence. (Tr. at 8–9). The Debtor stated that Vince came to her home, discussed what repairs needed to be done, and prepared a description of the work to be performed and an estimate of the cost. (Tr. at 11). She testified that she never had a written contract with Mr. Sacks, who performed the work. (*Id.*). Instead, the agreement covering the home improvement installment sale in this case is based upon the description of work and estimate prepared by Vince.

█ The Debtor testified that she understood that Vince was a broker, not the contractor who would perform the work.

(Tr. at 48). However, the fact that Vince was a broker and did not perform the work does not prevent him from being the "contractor" for purposes of HIFA. HIFA's definition of "contractor" states:

> **"Home improvement contractor"** or **"contractor"** means a person who sells goods and services, or agrees to furnish or render services, to a retail buyer pursuant to a home improvement installment contract, but not including the construction of new homes.

73 P.S. § 500–102(9). This definition includes a person who is *selling* home improvement services, even though the individual is not performing the services. Likewise, the exception in subsection (ii) of the definition of "home improvement installment contract" says that it does not apply to a "sale of goods by a person who neither directly nor indirectly performs or arranges to perform any services in connection with the installation of . . . the goods." Conversely, this implies that the definition does, in fact, apply to an agreement with an individual who does not actually perform the services, but "arranges" for the performance of home improvement work. Here, Vince sold the home repair services to the Debtor by arranging for the contractor who would perform the work. The Debtor testified that she asked Vince about getting her own contractor to do the repairs, but Vince insisted that he had to provide the contractor. (Tr. at 9, 54).

█ Parkway also argues that the direct loan exception applies to the Loan. The direct loan exception is found in sub-

---

**22.** The Debtor testified that adding the refinance of her existing mortgages and payment of other bills as part of the Loan occurred at the behest of Vince. (Tr. at 14–15, 52–53). The definition of "home improvement installment contract" does not except financing arrangements that add on payment of other

debts. 73 P.S. § 500–102(10). *See also Crisomia*, 2002 WL 31202722 at *14, n. 33; *Barber v. Fairbanks Capital Corp. (In re Barber)*, 266 B.R. 309 (Bankr.E.D.Pa.2001); *Gonzalez v. Old Kent Mortgage Co.*, 2000 WL 1469313 (E.D.Pa. Sept.21, 2000).

section (v) of the definition of "home improvement installment contract" which provides that HIFA does not apply if "the loan is contracted for or obtained directly by the retail buyer from the lending institution, person or corporation." 73 P.S. § 500–102(10). The Debtor responds by arguing that the financing technique known as "dragging the body" applies to this case. "Dragging the body" occurs when a seller or contractor does not finance the transaction, but plays an active role in arranging for financing between the retail buyer and the lender. *Barber,* 266 B.R. at 316–17.[23] The Debtor had no direct contact in this case with either Wharton or Parkway; the only person she dealt with was Vince (Tr. at 12), who made all of the financing arrangements in this case. Therefore, the direct loan exception does not apply here.

■ Based upon the foregoing, I conclude that the Loan is subject to HIFA. However, because the Loan will be rescinded, no award of actual damages which flow directly or indirectly from the imposition of improper finance charges is appropriate. *Steinbrecher v. Mid–Penn Consumer Discount Co.,* 110 B.R. 155, 160 (Bankr.E.D.Pa.1990). The Debtor also asserts that HIFA permits her to collect damages from Parkway based upon a "breach of warranty," since the work was not done correctly. *See* 73 P.S. § 500–208. However, the Debtor has not alleged any legal basis for a warranty claim, whether arising from contract, statute or common law. Neither has she made a sufficient record in support of such a claim. Therefore, the record does not provide a suffi-

cient basis on which to make a damage award under HIFA.

### 5. *The effect of the Debtor's rescission of the loan and successful action to enforce TILA.*

For the reasons set forth above, I concluded that this loan transaction violated TILA, and the Debtor is entitled to rescind the loan under 15 U.S.C. § 1635(a), because she did not receive proper notice of her right to rescind the loan transaction. In the Amended Complaint, the Debtor requests that her remedies for the TILA violations include the following: satisfaction of Parkway's security interests against her residence; disallowance of any claim based upon finance charges arising from the loan transaction; return of the Debtor's payments to Parkway; statutory damages of $2000 for TILA violations plus all finance charges and fees paid by the Debtor to Parkway; and reasonable attorney fees. The effect of the Debtor's rescission is explained in 15 U.S.C. § 1635(b) as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obli-

---

**23.** This financing technique has been recognized in matters involving automobile sales under the Motor Vehicle Sales Finance Act, 69 P.S. § 601 *et seq.* (*See Anderson v. Automobile Fund,* 258 Pa.Super. 1, 20–21, 391

A.2d 642, 652 (1978)) or home repairs and improvement sales under HIFA (*See Barber,* 266 B.R. at 316–17; *Gonzalez,* 2000 WL 1469313 at *1).

gor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b). Regulation Z, in § 226.23(d), similarly provides:

(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph

(d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

12 C.F.R. § 226.23(d).

Some courts have conditioned a debtor's right to rescind upon the debtor's tender of repayment to the creditor. *See Quenzer v. Advanta Mortgage Corp. USA*, 288 B.R. 884, 888 (D.Kan.2003)(Rescission "remains an equitable doctrine subject to equitable consideration.... Within the meaning of this law [TILA], 'rescission' does not mean an annulment that is definitively accomplished by unilateral pronouncement, but rather a remedy that restores the *status quo ante*.... Thus the court may condition rescission and the return of monies under the equitable remedy of 15 U.S.C.A. § 1635(b) on the debtor's return of property received in connection with the transaction." (citations omitted)).[24] *See also Armstrong*, 288 B.R. at 417–18 (holding that

---

**24.** The *Quenzer* Court also wrote that this interpretation of conditioning a borrower's rescission remedy is "confirmed by the TILA's legislative history, which clarifies that 'the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act.'" *Quenzer*,

288 B.R. at 888, *quoting* S.Rep.No. 368, 96th Cong., 2d Sess. 29 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 265. Indeed, in *Williams, infra.*, Judge Sigmund notes that the majority of circuit courts that have addressed this issue (outside of the bankruptcy context) condition rescission upon tender of payment. *Williams*, 291 B.R. at 655–56.

the court may condition the avoidance of the lender's security interest on the return of its money by the plaintiffs, and citing the "majority of courts" whose decisions hold likewise); *Apaydin v. Citibank Federal Savings Bank (In re Apaydin),* 201 B.R. 716, 724 (Bankr.E.D.Pa.1996)(same); *Thorp Loan and Thrift Co. v. Buckles (In re Buckles),* 189 B.R. 752, 764–66 (Bankr.D.Minn.1995)(holding that a debtor's receipt of the benefits of rescission under the TILA should be conditioned upon the debtor's tender of repayment).

In her decision in *Williams v. BankOne, N.A. (In re Williams),* 291 B.R. 636 (Bankr.E.D.Pa.2003), my colleague, now Chief Judge Sigmund, after a thorough analysis of the statute, regulation, legislative history, and decisional law, was not persuaded that courts may condition rescission under § 1635 on payment by the obligor. *Id.* at 657. Rather, Judge Sigmund concluded that, while courts may modify certain procedures (as described in § 226.32(d)(4)), courts cannot modify the voiding of a security interest. *Id.* at 657–58. Judge Sigmund reasoned that § 1635(b) is a deviation from the traditional common law rules of rescission, Congress intentionally having chosen to provide for the voiding of a creditor's security interest *before* the obligor tenders what is owed to the creditor. *Id.* at 658. I agree.

 In chapter 13, the Debtor may satisfy creditors over the life of her chapter 13 plan. To condition rescission on immediate repayment would deprive the Debtor of her right under bankruptcy law to extend the time for payment. Certainly, as *Williams* acknowledges, this puts the creditor at risk, since the obligor may either refuse to perform or be financially unable to do so. *Id.* However, the Debtor's chapter 13 plan can be used not only as a vehicle for the Debtor to repay her tender obligation over time, but can also serve as a means of protecting the creditor's interests. I look again to *Williams* and the remedy fashioned by Judge Sigmund.

Invoking the court's authority under § 226.23(d) to prescribe procedures by which the Debtor satisfies her tender obligation, Judge Sigmund ordered the debtor to file an amended plan separately classifying the creditor's claim and requiring its payment in full over the remaining plan life. In addition, the creditor's unsecured claim was memorialized in a judgment and the automatic stay modified to permit its recordation. *Id.* at 662. This result harmonizes the interplay between TILA and the Bankruptcy Code and the policies and goals underpinning each: the Debtor achieves vindication of her rescission rights under TILA, and her right to extend the time for payment under the Bankruptcy Code, yet also satisfies the lender's right to tender of payment, along with some security that it will be repaid, or, to be in a position to enforce its rights upon the Debtor's failure to make such payment. Without deciding that this remedy is appropriate in every situation, I conclude that this remedy is appropriate here. If, after setoff of the damages awarded below, the parties cannot agree upon the amount of Parkway's claim, the Court will fix an amount at a further hearing so that the Debtor will be in a position to propose the appropriate chapter 13 plan.

 The Debtor argues that she is entitled to statutory damages and reasonable attorney fees and costs based on 15 U.S.C. § 1640, which provides, in pertinent part:

(a) [A]ny creditor who fails to comply with any requirement imposed under this part, ... with respect to any person is liable to such person in an amount equal to the sum of—

....

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction,

... or

(iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000. . . .

15 U.S.C. § 1640(a)(2)(A). "Courts have routinely interpreted [§ 1640(a)](2)(A)(iii) to mean the appropriate penalty is double the finance charge up to a maximum of $2,000." *Williams,* 237 B.R. 590, 600, *citing Strange v. Monogram Credit Card Bank,* 129 F.3d 943, 946–47 (7th Cir.1997); *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir.1990). In addition, 15 U.S.C. § 1640(g) limits the recovery for multiple disclosure failures to a single recovery. Since the total finance charge paid by the Debtor is more than $2000, Parkway is liable to the Debtor for statutory damages in the amount $2,000 for its failure to deliver the Notice of Right to Cancel to the Debtor in violation of 15 U.S.C. § 1635(a), 12 C.F.R. §§ 226.17(a) and 226.23(b)(1).

Parkway's failure to honor the Debtor's valid rescission request gives rise to a separate award under 15 U.S.C. § 1640(a)(3), because "a lender's failure to honor a valid rescission demand is itself a TILA violation giving rise to statutory damages," and courts in this district have decided that "rescission and damage remedies under TILA are not cumulative." *Armstrong,* 288 B.R. at 419; *Williams,* 237 B.R. at 599. I will not, however, award the maximum amount of statutory damages for Parkway's failure to honor the Debtor's rescission. Parkway could not determine from the loan documentation that the Debtor did not receive proper notice of her right to rescind. Therefore, I will award the minimum damages amount permitted by § 1640(a)(2)(A)(iii) of $200. *Williams,* 291 B.R. at 664.

Furthermore, 15 U.S.C. § 1640(a)(3) permits a court to include the costs of the TILA action and reasonable attorneys' fees as damages in a successful action to enforce TILA liability or the right of rescission under § 1635. No information has been submitted regarding the fees and costs incurred by the Debtor's attorney in this matter. A hearing shall also be set to determine the appropriate amount of attorney fees and costs that should be awarded to the Debtor in this proceeding.

## SUMMARY

For the reasons set forth above, I conclude that: (i) the loan is not subject to HOEPA; (ii) the Debtor is entitled to rescind the loan because she did not receive proper disclosure of her right to rescind the loan transaction, thereby rendering the Parkway mortgage void; (iii) the Debtor's request to void Parkway's lien against her Property for failure to obtain a valid notary on the mortgage is denied; ·(iv) the Debtor's claims against Wharton based upon common law fraud and breach of fiduciary duty are denied; (v) the broker agreement between the Debtor and Wharton violated the Credit Services Act and the Debtor is entitled to damages in the amount of $5,470; (vi) although this Loan transaction is subject to HIFA, the Debtor is not entitled to any damages based upon improper finance charges, since the Loan is being rescinded, and the Debtor has failed to provide any basis for a breach of warranty claim; and (vii) the Debtor is entitled to statutory damages under TILA in the amount of $2,200. A further hearing shall be scheduled to determine the amount of Parkway's claim, the amount of reasonable attorney fees and costs the Debtor may recover pursuant to 15 U.S.C.

§ 1640(a)(3), and whether the defendants are entitled to any relief on their respective cross-claims.

An appropriate Order follows.

## ORDER

**AND NOW,** this 14th day of April, 2004, after a trial on the merits and for the reasons set forth in the foregoing Memorandum Opinion, it is hereby **ORDERED** and **DECREED** that:

(1) with respect to Count I of the Amended Complaint, judgment is entered in favor of Maxine B. Bell (the "Plaintiff"), in part, and against the defendant Parkway Mortgage, Inc. ("Parkway"), in part, as follows:

 (i) the loan transaction between the Plaintiff and Parkway, as evidenced by a Balloon Note dated June 30, 1999 in the original principal amount of $64,000, and secured by a Mortgage dated June 30, 1999, placing a lien against the Plaintiff's real property located at 1619 Olive Street, Philadelphia, PA (the "Property"), is rescinded, and the Mortgage dated June 30, 1999 granted by the Plaintiff to Parkway (the "Mortgage") is void. On or before **May 7, 2004,** Parkway shall take any action necessary to reflect the termination of the Mortgage. On or before **May 14, 2004,** Parkway shall deliver to the Debtor a copy of all documents reflecting the termination of the Mortgage;

 (ii) judgment is entered in favor of the Plaintiff and against defendant Parkway in the amount of two thousand two hundred dollars ($2,200) for violations of the Truth–In–Lending Act pursuant to 15 U.S.C. § 1640(a)(2)(A);

 (iii) judgment is entered in favor of the Plaintiff and against the defendant Parkway for the Plaintiff's attorney fees and costs, in a reasonable amount to be determined at a further hearing before this Court as described below;

(2) And, further, with respect to Count I, judgment is entered in favor of the defendants and against the Plaintiff with respect to the Plaintiff's claim that the loan transaction is subject to the Home Ownership Equity Protection Act, 15 U.S.C. § 1639 *et seq.,*

(3) An unsecured claim of defendant Parkway will be allowed in an amount to be determined at a further hearing before this Court as described below and will be treated in an amended plan to be filed by the Plaintiff, which provides for payments to the chapter 13 Trustee over a period of time no longer than the life of the plan in an amount equal to the full amount of the claim. The Plaintiff's obligation to defendant Parkway may be recorded as a judgment and, upon determination of the amount of the claim, the automatic stay of 11 U.S.C. § 362(a) will be lifted for the limited purpose of recording the judgment;

(4) With respect to Count II of the Amended Complaint, judgment is entered in favor of the defendants and against the Plaintiff;

(5) With respect to Count III of the Amended Complaint, judgment is entered in favor of the Plaintiff and against the defendants, jointly and severally, in the amount of five thousand, four hundred seventy dollars ($5,470) for violations of the Pennsylvania Credit Services Act, 73 P.S. § 2181 *et seq.,*

(6) And, further, with respect to Count III of the Amended Complaint, judgment is entered in favor of the defendants and against the Plaintiff

with respect to the Plaintiff's claims for fraudulent conduct and breach of fiduciary duty;

(7) With respect to Count IV of the Amended Complaint, judgment is entered in favor the defendants and against the Plaintiff; and

it is further **ORDERED** that a hearing will be held on **May 18, 2004** at 1:00 p.m. in Bankruptcy Courtroom No. 1, Robert N.C. Nix Federal Building & Courthouse, 900 Market Street, Second Floor, Philadelphia, Pennsylvania to determine: (i) the amount of Parkway's claim, (ii) whether either Parkway or Wharton is, in light of this decision, entitled to any relief on their respective cross-claims, and (iii) the amount of reasonable attorney fees and costs to be awarded to the Plaintiff pursuant to 15 U.S.C. § 1640(a)(3). Any pre-hearing submissions should be filed and served no later than May 14, 2004, with courtesy copies to be delivered to chambers.