In re Debra **HARRIS–PENA**, Debtor.

Debra Harris–Pena, Plaintiff,

v.

The CIT Group/Consumer Finance, Inc. and Habana Acquisition Corp., Defendants.

Bankruptcy No. 07–14756(JKF).
Adversary No. 08–0002 SR.

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 13, 2009.

---

———

Peter Schneider, Esquire, Community Legal Services, Inc., Philadelphia, PA, for Plaintiff.

Sherri J. Braunstein, Esquire, Udren Law Offices, P.C., Cherry Hill, NJ, for CIT.

William C. Miller, Chapter 13 Trustee, Philadelphia, PA, for Chapter 13 Trustee.

## Memorandum Opinion

STEPHEN RASLAVICH, Chief Judge.

Before the Court are cross-motions for summary judgment by the plaintiff, Debra Harris–Pena ("Debtor"), and defendant, CIT Group/Consumer Finance, Inc. ("CIT"). Debtor borrowed $51,660 from CIT (the "CIT Loan") to refinance a purchase money mortgage loan which she obtained from Habana Acquisition Group ("Habana") in connection with the purchase of her home at 1949 Ashley Road, Philadelphia, Pennsylvania (the "Property").

In this adversary proceeding, Debtor asserts claims against CIT under: (1) Pennsylvania's usury law, Act 6 of 1974 ("Act 6"), 41 P.S. § 101 *et seq.*; (2) the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; and (3) the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. § 1639. Debtor moves for summary judgment as to liability on her claims under each of these statutes and CIT moves for summary judgment on the same claims.[1] Debtor also moves for summary judgment as to statutory damages on her TILA and HOEPA claims. Upon consideration of the motions, summary judgment shall be granted in Debtor's favor and against CIT as to liability on her claim under Act 6. Both parties' motions for summary judgment shall be denied as to Debtor's other claims.[2]

### Background

#### Debtor's Bankruptcy Case and this Adversary Proceeding

In August of 2007, Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code. On January 3, 2008, she commenced this adversary proceeding against CIT by filing a complaint. She subsequently filed an amended complaint (the "Amended Complaint") against both CIT and Habana. However, in July of 2008, Debtor settled with Habana, leaving CIT again as the only defendant against whom she is proceeding.

#### Background and Facts Concerning the Loans

For three years, from approximately 1996 to 1999, Debtor and her husband lived in and rented a property from Tobias Biddle, the President of Habana. *Harris–*

---

1. CIT moves for summary judgment on Debtor's claims under Act 6, TILA and HOEPA and contends that, to the extent the aforementioned claims serve as the basis for Debtor's claims in Count IV and V of the Complaint, it is entitled to summary judgment on those claims as well.

2. The hearing on the parties' cross-motions for summary judgment was held before the Honorable Jean K. FitzSimon. Subsequently thereto, this adversary proceeding was re-assigned to the undersigned Judge. The hearing record on the cross-motions has been transcribed and reviewed. Pursuant to Rule 9028 of the Federal Rules of Bankruptcy Procedure, which makes Rule 63 of the Federal Rules of Civil Procedure applicable hereto, this decision is being issued by the undersigned Judge whom certifies that he is familiar with the record and has determined that the motions can be decided without any prejudice to the parties.

*Pena Dep. at 12–13.* Debtor, however, was interested in owning a home and she shared this information with Biddle. *Id.* at 13–16. He informed her that Habana owned a Property which she could purchase and, further, that Habana would finance the purchase for her. *Id.* at 16.

In August of 1999, Debtor borrowed $58,500 from Habana to purchase the Property. *Id.* at 14–16; *Exhibit H–3 to Harris–Pena Dep.* In connection with this loan, Debtor executed a note (the "Note") for the aforementioned amount, obligating her to make monthly payments of $601.74 and pay the balance due thereunder on September 1, 2029.[3] *Id.* As security for the loan, Debtor executed a purchase money mortgage (the "Habana Mortgage") in favor of Habana. *Exhibit H–2 to Harris–Pena Dep.* In connection with the transaction, Debtor purchased title insurance in the amount of $556.88. *Declaration of Debra Harris–Pena in Support of Plaintiff's Motion for Summary Judgment ("Harris–Pena Decl.")* at ¶ 7 & *HUD–1 Settlement Sheet attached thereto.* Habana was listed as the "insured" on the policy. *See Exhibit B–11 (Policy of Title Insurance issued by First American Title Insurance Company) to Biddle Dep.*

At some point in time, Biddle told Debtor that he was tired of receiving monthly payments from her on the Note. *Harris–Pena Dep. at 31–34.* He wanted her to refinance the loan from Habana. *Id.*[4] Either through Biddle or through a broker to whom Biddle referred business, Debtor was put in touch with CIT which agreed to do a refinancing for her.[5] Biddle hoped that the refinancing would pay off Debtor's loan from Habana in full; however, he knew at or shortly before the closing on Debtor's refinancing with CIT that there would be a balance still due and owing on the Note. *Biddle Dep.* at 22. According to a letter, dated March 26, 2001, from Biddle (the "Biddle Letter"), the payoff on the Note was $58,417.87. *Exhibit B–3 to Biddle Dep. (Biddle Letter).* This amount included a satisfaction fee of $50.00 which, Biddle explained, was the cost for removing a mortgage from public records. *Biddle Dep.* at 50, *Exhibit B–3 to Biddle Dep. (Biddle Letter).* Biddle included this charge in the pay-off because he intended to file a satisfaction on the Habana Mortgage so that it would be removed from the public record. *Biddle Dep.* at 50. While Biddle provided the payoff information to the title company that was involved with Debtor's refinancing and possibly to CIT as well, Biddle does not think it was given to the Debtor. *Biddle Dep.* at 20–21.

3. For reasons that are not clear from the record, Debtor also executed a Balloon Note for the same loan from Habana, obligating her to make monthly payments of $601.74 and pay the balance due thereunder on February 1, 2001. *Exhibit H–1 to Harris–Pena Dep. (Balloon Note ).* The interest rate on the Balloon Note is the same as on the Note. However, the Balloon Note was never utilized. *Biddle Dep.* at 41–42. As Biddle noted at his deposition, the Habana Mortgage specifically references the terms of the Note. *Id.; Exhibit H–2 to Harris Pena Dep. (Habana Mortgage).*

4. At Debtor's Deposition, she testified that Biddle repeatedly told her that he wanted "all

my money at one time, Debra" and that CIT was willing to pay him "all at one time." Harris–Pena Dep. at 31–32.

5. According to Debtor's deposition testimony, Biddle facilitated the refinancing with CIT and she did not have any contact with CIT until the loan closing. *Harris–Pena Dep. at 21–30.* However, Biddle testified during his deposition that he gave Debtor's name to a mortgage broker to whom he referred refinancing business and that the Broker, in turn: (i) contacted the Debtor; and (ii) chose CIT as the company to refinance Debtor's loan. *Biddle Dep.* at 15–17.

On or about March 21, 2001, Biddle executed a Mortgage Subordination Agreement between CIT and Habana. *Biddle Dep.* at 29–31; *Exhibit 2 to Biddle Dep. (Mortgage Subordination Agreement).* According to the Mortgage Subordination Agreement, Debtor executed a mortgage in the amount of $15,000 (the "$15,000 Mortgage") in favor of Habana on March 30, 2001. *Id.* Biddle had no explanation for why the Mortgage Subordination Agreement, dated March 21, 2001, referenced a mortgage and note allegedly executed by the Debtor nine days later. *Biddle Dep.* at 30. Insofar as Biddle remembers, the $15,000 Mortgage was intended to make up the difference between the proceeds which he received from the CIT Loan and the balance due to Habana on the Note. *Biddle Dep.* at 32–33.

Pursuant to the terms of the Mortgage Subordination Agreement, Habana agreed that the $15,000 Mortgage was subordinate and junior to CIT's mortgage lien on the CIT Loan. *Id.* However, there is no evidence that Debtor ever executed a $15,000 mortgage in favor of Habana and no evidence that such a mortgage was ever recorded, Importantly, the Mortgage Subordination Agreement does not mention subordinating the Habana Mortgage to the CIT Mortgage. *Biddle Dep., Exhibit 2 (Mortgage Subordination Agreement).* The apparent reason that the Habana Mortgage is not mentioned in the Mortgage Subordination Agreement is that Biddle planned on satisfying that mortgage and having Debtor execute a separate $15,000 Mortgage which he would then record against the Property, thereby giving him a second lien on the Property subordinate to CIT's lien.

The CIT Loan closing (the "Loan Closing") took place on March 30, 2001, at Biddle's office. *Harris–Pena Decl.* at ¶ 2;

*Harris–Pena Dep.* at 23–25. Prior to the closing, Debtor never received any written disclosures about the CIT Loan. *Harris–Pena Decl.* ¶¶ 5–6. She did not bring anything with her to the closing, including any evidence to show that she had purchased title insurance for the Property in 1999. *Id.* at 104. However, Debtor did not know what title insurance was and had no recollection of having previously purchased any. *Id.* There is a document titled "Title Insurance Election" which appears to contain Debtor's signature and is dated 3/30/01 (the date of the closing on her loan with CIT). On this document, Debtor checked the box electing to have CIT obtain a title insurance policy for her. *See Exhibit H–15 to Harris–Pena Dep.*

While Biddle's presence at the Loan Closing is undisputed, *see Biddle Dep.* at 24, the extent of his involvement in the refinancing and the extent of his communication with CIT about the refinancing is in dispute. Debtor's testimony suggests that: (i) Biddle arranged the refinancing with CIT; (ii) she received no communication from CIT prior to the Loan Closing; (iii) she never filled out a mortgage application form for the refinancing; (iv) Biddle (rather than Debtor) was the only one who communicated with CIT about the refinancing; and (v) Debtor had no involvement in the refinancing other than to show up at the Loan Closing and sign the documents which she was told to execute. *See Harris–Pena Dep.* at 21–30, 51–53, 81. Biddle, on the other hand, testified that he had no correspondence with CIT until shortly before or at the Loan Closing and that he had no communication with CIT thereafter. *See Biddle Dep.* at 25–26.

At the Loan Closing, Debtor executed a promissory note (the "Promissory Note") in the amount of $51,660, with interest at

the rate of 11.99% per annum.[6] *Exhibit H–18 to the Harris–Pena Dep.* As security for the CIT Loan, Debtor executed a mortgage (the "CIT Mortgage"), also dated March 30, 2001, granting CIT a lien on the Property.[7] *Exhibit H–17 to the Harris–Pena Dep.*

According to the HUD–1 Settlement Statement, the Settlement Agent at the closing on March 30, 2001 was Express Financial Services.[8] Page 2 of the Settlement Statement lists the following amounts as Settlement Charges:

| | |
|---|---:|
| Underwriting Fee to CIT | $ 495.00 |
| Loan Discount to CIT | $ 504.10 |
| Appraisal Fee to Raymond Rizzo | $ 250.00 |
| Appraisal Review Fee to CIT | $ 42.00 |
| Credit Bureau Fee to CIT | $ 4.00 |
| Mortgage Broker Fee to Choice One Mortgage | $ 2,550.00 |
| Mortgage Broker Fee by Lender to Choice One Mortgage | $ 952.00 |
| Overnight Courier Fee to CIT | $ 30.00 |
| Closing/Escrow/Settlement Fee to Express Financial Services | $ 175.00 |
| Title examination fee to Express Financial Services | $ 75.00 |
| Title insurance to Express Financial Services | $ 540.75 |
| Recording Fees: Mortgage | $ 43.50 |
| Disbursements to others | $47,845.84 |
| TOTAL SETTLEMENT CHARGES | $52,305.19 |

*Exhibit D–9 to Defendant's Motion.*

Habana received $43,000 of the disbursements from the CIT Loan. *Exhibit H–16 to the Harris–Pena Dep.* Notably, the difference between the $58,417.87 payoff which Debtor owed on the Note and the $43,000 which Habana received from the CIT Loan is $15,417.87, which supports Biddle's recollection that the $15,000 Mortgage was intended to make up the difference between the $43,000 in proceeds which he received from the CIT Loan and the balance due to Habana on the Note.

The action which Biddle subsequently took (after Habana received the $43,000 from the CIT Loan) to recover the balance owed on the Note is disputed; however, it is undisputed that Biddle intended: (i) to have the Habana Mortgage marked satisfied and removed from the public record; (ii) to obtain a second mortgage on the Property in favor of Habana for approximately $15,000 to secure the balance that Habana was owed on the Note; and (iii) for the second mortgage in favor of Habana to be subordinate to the CIT Mortgage. *Biddle Dep.* at 27, 32–36, 40. Contrary to Biddle's intention, the Habana Mortgage was not marked satisfied until after this adversary proceeding was filed.[9] Moreover, as stated above, there is no mortgage for $15,000 or thereabout of record against the Property. The only other mortgage of

---

**6.** The terms of the Promissory Note obligated Debtor to make an initial monthly payment of $720.25 followed by 359 monthly payments in the amount of $530.98. *Exhibit H–18 to the Harris–Pena Dep.*

**7.** The CIT Mortgage contains the following language:

I further warrant that the lien created by this mortgage is a valid and enforceable first lien, subordinate only to easements and restrictions of record on the date of this mortgage, and that during the entire term of the note, such lien will not become subordinate to anything else.

*Exhibit H–17 to Harris–Pena Dep.*

**8.** The HUD–1 Settlement Statement is a form "prescribed by the Secretary … for setting forth settlement charges in connection with either the purchase or the refinancing … of 1– to 4–family residential property." 24 C.F.R. § 3500.2(b)(current through March 30, 2001).

**9.** In the Settlement and Release of Claims by and Between Debra Harris–Pena and Habana Acquisition Corporation, it states that "[o]n May 28, 2008, Habana recorded with the Office of the Recorder of Deed of Philadelphia County a Satisfaction of the Purchase Money Mortgage [which is the mortgage executed by Debtor in favor of Habana for the loan of $58,500], executed on May 13, 2008, and recorded under document identification number 51911969." *See Docket Entry No. 25* (underlining added).

record against the Property (other than the Habana Mortgage and the CIT Mortgage) is a mortgage, dated December 31, 2000, in favor of Habana for $5,000 (the "$5,000 Mortgage") that was not recorded until May 23, 2001. *Exhibit 9 to Biddle Dep.*

According to the $5,000 Mortgage, it constitutes security for a $5,000 loan which Habana made to Debtor that is evidenced by another note (the "$5,000 Note"). *Exhibit 10 to Biddle Dep.* While Biddle could not recall the reason for the $5,000 Note, he suggested that it may have been used to cover the cost of repairs that needed to be made to the Property. *Biddle Dep. at 44–45.* According to its terms, the $5,000 Note obligated Debtor to commence making monthly payments of $87.39 on February 1, 2001, which was approximately two months before the Loan Closing. *Exhibit 10 to Biddle Dep.* Interestingly, Debtor admitted signing the $5,000 Note but denied that it contained the terms currently set forth therein when she signed it.[10] *Harris–Pena Dep.* at 47–50. Debtor also denied signing the $5,000 Mortgage. *Harris–Pena Dep.* at 46–47. However, for purposes of resolving the matters herein, it is irrelevant whether Debtor signed the $5,000 Note in its current form and whether she signed the $5,000 Mortgage.

10. When asked about the $5,000 Note, Debtor testified as follows:

Q. I'm going to show you what we've marked as H–5. It's a note, two pages.
A. On his page right here?
Q. Referring to H–5.
A. H–5, the first page, it didn't have this stuff right here.
Q. It didn't have what.

\* \* \*

Q. You're referring to number two interest and where it's typed in 12.000 percent?
A. This wasn't filled out up here. There was nothing filled out.
Q. Be specific. Point to what wasn't filled out so what we can put in on the record.

When Biddle was asked at his deposition what, if anything, he told Debtor after discovering that her refinancing would leave a balance due on the Note, he testified that he told her:

There's not enough to be enough funds to pay off the mortgage, and I'd like to record a receivable for the balance.

*Biddle Dep.* at 22–23. According to Biddle, Debtor agreed to his request. *Id.* at 23.

Debtor's version of what Biddle did to recover the balance due on the Note is quite different. According to Debtor, she thought that she was only going to be paying CIT and "didn't expect to pay Mr. Biddle." *Id.* at 83. However, Biddle called her and told her that she still owed him $87 per month. *Id.* at 82–84. When she asked him why, he told her that "CIT didn't give him all his money that he asked them for." *Id.* at 83–84. According to Debtor, although she repeatedly asked Biddle for the balance owed on the Note, he never answered her question. *Id.* She continued making monthly payments of $87 to Biddle for "more than two years." *Id.* at 84–85.

## Analysis

### I. Standard of Review

Either party to a lawsuit may file a motion for summary judgment. Pursuant

A. There wasn't no 5,000.
Q. Upper right.
A. That wasn't there. It had no interest rate on there.
Q. The 12 percent. Okay.
A. And it didn't have no 1st of February and all this dates, these months and stuff, it wasn't on there.
Q. Referring to paragraph 3, February 1, 2001 [the date when the payments under the $5,000 Note commenced] wasn't there and January 1, 2008 [the "maturity date" of the $5,000 Note] wasn't there.
A. Yes, it wasn't there. It just had the address where I paid him. And than it just had this amount right here, 87.39.

*Harris–Pena Dep.* at 47–48.

to Fed.R.Civ.P. 56,[11] the motion will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment is not defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990) (citation omitted).

The fact that the parties have filed cross-motions for summary judgment "does not mean that the case will necessarily be resolved at the summary judgment stage." *Reading Tube Corp. v. Employers Ins. of Wausau*, 944 F.Supp. 398, 401

(E.D.Pa.1996). Each party "must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Id.*

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party has met its initial burden, the non-moving party may not rely merely on bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982), but instead must present 'specific facts showing that there is a genuine issue for trial,' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e))." *J & J Sports Productions, Inc. v. 4326 Kurz, Ltd.*, 2009 WL 1886124, at *3 (E.D.Pa. June 30, 2009).

## II. Act 6 Claim

██ Act 6 is a " 'comprehensive interest and usury law with numerous functions,' one of which is that 'it offers homeowners with "residential mortgages" a measure of protection from overly zealous "residential mortgage lenders." ' " *In re Graboyes*, 223 Fed.Appx. 112, 114 (3d Cir.2007) (quoting *Beckett v. Laux*, 395 Pa.Super. 563, 567, 577 A.2d 1341, 1343 (1990)). *See also Crossley v. Lieberman*, 868 F.2d 566, 570 (3d Cir.1989) ("Act 6 was promulgated to protect debtors who carry mortgage loans"). It establishes a maximum lawful rate of interest for residential mortgages that are covered by the Act. 41 P.S. §§ 201 & 301. Pursuant to § 301, the maximum lawful rate of interest for residential mortgages for the month of March, 2001, was 8%. 31 Pa. B. 1591. The interest rate for the CIT Mortgage is 11.99%. Consequently, *if the CIT Mortgage is subject to*

---

**11.** Rule 56 is applicable hereto pursuant to Fed.R.Bankr.P. 7056.

*Act 6*, the interest charged for the mortgage was 3.99% above the lawful rate of interest. Debtor argues that the CIT Mortgage is within the scope of Act 6; not surprisingly, CIT contends the opposite.

■ In 2001,[12] Act 6 defined the term "residential mortgage" as "an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($50,000) or less,[13] evidenced by a security document secured by a lien upon real property located within this Commonwealth[.]" 41 P.S. § 101 (2001).[14] Debtor contends that, even though the face amount of the Promissory Note is $51,660.00, the "principal amount" of her loan was not more than $47,244.12. As support for this contention, Debtor cites to the definition for "finance charge" in Act 6. *See Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment as to Defendant CIT Group/Consumer Finance Inc. ("Debtor's Brief")* at III(A)(1).

Act 6 defines the term "finance charge", in pertinent part, as follows;

> [T]he total cost of a loan or charge for the use of money, including any extensions or grant of credit regardless of the characterization of the same and includes any interest, time price differential, points, premiums, finder's fees, and other charges levied by the residential mortgage lender directly or indirectly against the person obtaining the loan or against the seller, lender, mortgagee or any other party to the transaction except any actual settlement costs. The finance charges plus the actual settlement costs charged by the residential mortgage lender shall include all charges made by the residential mortgage lender to the residential mortgage debtor *other than the principal of the loan.*

41 P.S. § 101 (2001) (emphasis added). Based on this definition, there is a distinction in Act 6 between the following components of a loan: (i) the finance charge; (ii) settlement costs; and (iii) the principal of the loan.

The proposition that the face amount of a note and the principal amount of the loan are not the same for purposes of Act 6 was recognized by the Pennsylvania Superior Court in *General Electric Credit Corporation v. Slawek*, 269 Pa.Super. 171, 409 A.2d 420 (1979) (*en banc*). In this case, the

---

**12.** As noted above, the CIT Loan closed in March of 2001.

**13.** Act 6 has since been amended to increase the principal amount above $50,000. *See* 41 P.S. § 101 (Supp.2009).

**14.** CIT argues unpersuasively that the definition of a "residential mortgage" under Act 6 is a mortgage that "on its face" is for fifty thousand dollars or less. *Memorandum of law of the Defendant CIT Group/Consumer Finance, Inc. in Support of its Motion for Summary Judgment ("CIT's Brief")* at 13. By viewing the definition of "residential mortgage" in this manner, CIT is improperly merging the requirements set forth in the definition. As the district court aptly noted in *First Business Credit Co. v. Grayboyes (In re Grayboyes)*, 2006 WL 437546 (E.D.Pa. Feb.22, 2006), *aff'd*, 223 Fed.Appx. 112 (3d Cir.2007), the definition of "residential mortgage" in Act 6 contains "three primary elements":

> (1) a monetary requirement that the secured loan include a principal of $50,000 or less; (ii) a documentation requirement that the borrower execute a document granting the lender a lien upon real property located within the Commonwealth; and (iii) a physical requirement that the property subject to the lien contains two or fewer residential units.

*Id.* at *7. Contrary to what CIT asserts, the "monetary requirement that the secured loan include a principal of $50,000 or less" is separate from the "documentation requirement that the borrower execute a document granting the lender a lien upon real property."

borrowers executed a promissory note in the amount of $65,849.78 and a mortgage on their residence in favor of the lender.[15] The Superior Court observed that, although the face amount of the promissory note was $65,849.78, that amount included "finance charges and other fees" and that the "principal amount" of the loan was less than $50,000, such that the transaction fit within the definition of "residential mortgage" covered by Act 6. *Id.* at 422 n. 5.

Based on the plain language of the definition for "finance charge" in Act 6 and the Pennsylvania Superior Court's application in *Slawek* of the Act's definition for "residential mortgage," this Court concludes that the principal amount of a loan, for purposes of Act 6, excludes finance charges and actual settlement costs. Section 101 of Act 6 also defines the term "actual settlement costs," stating in relevant part:

Actual settlement costs means reasonable sums paid for:

(a) Any insurance premiums which have been approved by the Insurance Commissioner of the Commonwealth.

(b) Title examination and search, and examination of public records.

(c) The preparation and recording of any or all documents required by law or custom for settlement.

(d) Appraisal and/or survey of property securing the loan.

(e) A single service charge, which shall include any consideration paid by the residential mortgage debtor and received and retained by the residential mortgage lender for or related to the acquisition, making, refinancing or modification of a residential mortgage loan, plus any consideration received by the residential mortgage lender for making a mortgage commitment, whether or not an actual loan follows such commitment.

\* \* \*

(f) Charges and fees necessary for or related to the transfer of the property or the closing of the residential mortgage loan, paid by the residential mortgage debtor and received by any party other than the residential mortgage lender, whether or not paid by the residential mortgage debtor directly to the third party or to the residential mortgage lender for payment to the third party.

41 P.S. § 101 (2001). Based on this definition, the "actual settlement costs" for the CIT Loan included the following items:

(i) Appraisal Fee of $250.00;

(ii) Mortgage Broker Fee of $2,550.00;

(iii) Mortgage Broker Fee by Lender of $952.00;

(iv) Title Examination fee of $75.00; and

(iv) Recording Fee of $43.50

Since these amounts total $3,870.50, the "principal amount" of the CIT Loan is less

---

**15.** In *Slawek*, the mortgage loan was used to finance the acquisition of a sailboat. At the time of the loan transaction, the definition of "residential mortgage" in Act 6 included such transactions. By an amendment enacted in 1978, the Pennsylvania legislature added a second sentence to the definition of "residential mortgage" to limit the application of Act 6 to " 'transactions where the principal purpose of the transaction is the purchase of, or improvement or repair in connection with the acquisition of, residential real property[.]' "

*Slawek*, 269 Pa.Super. at 181 n. 9, 409 A.2d at 424 n. 9 (*quoting* 1978 Amendment to Act 6). However, by an amendment in 1979, the legislature deleted the second sentence thereby restoring the definition of "residential mortgage" to its pre–1978 version. In any event, the fact that the loan transaction was used to finance the acquisition of a sailboat was irrelevant to the reasoning and conclusion of the Slawek court that the loan transaction involved a residential mortgage within the meaning of Act 6.

than $50,000.00 ($51,660.00–$3,870.50 = $47,789.50) which means that the loan is within the scope of the Act.[16]

■ However, CIT raises another argument in opposition to Debtor's contention that the CIT Loan is subject to Act 6. CIT argues that its loan was always "in first lien position" and, consequently, that the interest rate limitations of Act 6 are inapplicable to its loan pursuant to the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), 12 U.S.C. § 1735f–7a(a)(1).[17] The DIDMCA provides, in pertinent part, that state laws such as Act 6 which limit interest rates do not apply to loans that are, *inter alia*, secured "by a first lien on residential real property[.]" 12 U.S.C.A. § 1735f–7a(a)(1)(A).

It is undisputed that, at the time of the Loan Closing, both CIT and Biddle intended for the CIT Loan to be secured by a first lien on the Property. However, irrespective of their intentions to eliminate the Habana Mortgage or to subordinate it, Habana, and not CIT, continued to possess the first lien on the Property. *Grigsby v. Thorp Consumer Discount Co. (In re Grigsby)*, 119 B.R. 479, 490 (Bankr.E.D.Pa.

1990) (holding that first lien existed on debtor's residence "irrespective of the intentions of the parties to eliminate it."), *vacating judgment and remanding action to bankruptcy court on other grounds*, 127 B.R. 759 (E.D.Pa.1991).

The evidence in the record demonstrates that, at the time of the Loan Closing, Habana maintained a first lien position on the Property because: (i) a balance remained on Habana's original loan to Debtor after the CIT Loan was made; and (ii) the Habana Mortgage was not marked satisfied until after this adversary proceeding was commenced.

CIT and Habana knew that the proceeds from the CIT Loan would not pay off the balance which Debtor owed to Habana on the Note. They clearly made an effort to address the situation (through the Mortgage Subordination Agreement and the $15,000 Mortgage that was drafted but never executed). Nevertheless, their efforts failed, and the Habana Mortgage remained in the first lien position after the closing on the CIT Loan.[18]

Consequently, Act 6 and its interest rate limitations are applicable to CIT's Loan.

---

**16.** The Federal Disclosure Statement for the CIT Loan lists the "finance charge" of the loan as "$143,482.17" and the "amount financed" as "$47,859.90."

**17.** Subsection 1735f–7(a)(1) provides, in pertinent part:

(a) Applicability to loan, mortgage, credit sale, or advance; applicability to deposit, account, or obligation

(1) The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—

(A) secured by a first lien on residential real property, by a first lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, or

by a first lien on a residential manufactured home; ...

12 U.S.C.A. § 1735f–7a(a)(1).

**18.** Debtor warranted in the CIT Mortgage that the lien created by the mortgage was enforceable as a "first lien." *See supra* n. 7. However, just as the intention of CIT and Biddle cannot transform the CIT Mortgage into a first lien, Debtor's warranty cannot do so either. Moreover, it is evident from the record that CIT and Habana, through Biddle, discussed the subordination of Habana's lien to CIT's lien and that they and not Debtor created the purported framework for subordinating Habana's lien. Consequently, it was through no fault of the Debtor that the Habana Mortgage remained in the first lien position after the refinancing by CIT.

Since the rate of interest on the CIT Mortgage/Loan is 11.99% and the maximum lawful rate at the time of the closing thereon was 8%, Debtor is entitled to summary judgment as to liability on Count I of the Amended Complaint.

### III. TILA Claim

■ Congress enacted TILA in 1969 to "strengthen the national economy by enhancing the informed use of credit." *Riethman v. Berry*, 287 F.3d 274, 279 (3d Cir.2002). *See also* 15 U.S.C. § 1601(a) ("It is the purpose of [TILA] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit[.]"). The statute is designed to put "the consumer on an equal footing with the lender," *Milledge v. Chase Bank*, 2007 WL 4179847, at *2 (E.D.Pa. Nov.26, 2007), by "requiring certain disclosures regarding loan terms and arrangements." *McCutcheon v. America's Servicing Company*, 560 F.3d 143, 147 (3d Cir.2009). *See also Rossman v. Fleet Bank (R.I.) National Association*, 280 F.3d 384, 389 (3d Cir. 2002) (TILA "requires a series of disclosures that must be made before the consummation (the point at which legal obligations attach) of the underlying credit agreement[.]").

Congress delegated the task of "prescrib[ing] regulations to carry out the purposes of" TILA to the Federal Reserve Board (the "Board"). 15 U.S.C. § 1604(a). In response, the Board promulgated "Regulation Z," 12 C.F.R. Pt. 226, and issued extensive "Official Staff Interpretations," 12 C.F.R. Pt. 226 Supp. I. *Id.* The Third Circuit has stated that "[i]n light of Congress' explicit delegation of authority to the Board," courts should "defer quite broadly to the Board's interpretation." *Roberts v. Fleet Bank*, 342 F.3d 260, 265 (3d Cir.2003).

One of the items which TILA requires lenders to disclose is the applicable "finance charge" for a mortgage. *McCutcheon v. America's Servicing Company*, 560 F.3d at 147. The term "finance charge" means the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Debtor contends that CIT violated TILA because it underdisclosed her "finance charge" by failing to include therein: (i) the $151.41 which she was charged for title insurance in excess of the "refinance rate"; and (ii) the $75.00 title examination fee which she was charged.

Fees for title insurance and title examination are generally exempted from computation of a finance charge "in extensions of credit secured by an interest in real property." 15 U.S.C. § 1605(e)(1). However, they are included as part of the finance charge if they are not "bona fide and reasonable in amount[.]" 12 C.F.R. § 226.4(c)(7)(i). In other words, fees for title insurance and title examinations must be included as part of the finance charge to the extent that are: (i) unreasonable; or (ii) not bona fide. The Court will separately examine these two fees.

### Title Insurance Fee

■ Debtor contends that she was improperly charged the basic fee of $540.75 for title insurance instead of the refinance rate of $389.34. Consequently, she argues, the difference between the two rates, namely $151.41, should have been included in the finance charge because the excess charge was unreasonable. *Debtor's Supporting Brief at (III)(B)(3)(b)*. These rates, which are published in the Title Insurance Rating Bureau of Pennsylvania (the "TIRBOP Manual"), are the ones applicable in

March of 2001 for title insurance for a loan of $51,660. Courts generally use the rates published in the TIRBOP Manual in determining whether a fee charged for title insurance in Pennsylvania was reasonable. *Madera v. Ameriquest Mortgage Company (In re Madera)*, 388 B.R. 586, 599 (E.D.Pa.2008); *Jones v. Aames Funding Corporation*, 2006 WL 2845689, at *5 (E.D.Pa. March 8, 2006).

According to § 5.6 of the TIRBOP Manual, when a refinance loan is made within three years from the date of closing of a previously insured mortgage and the premises to be insured is identical to the real property previously insured and there has been no change in the fee simple ownership, the refinance rate applies.[19] *See TIRBOP Manual* § 5.6. In Debtor's Brief, she acknowledges that case law in the Eastern District of Pennsylvania "holds that 'if a borrower contends that a lender failed to obtain the lowest title insurance rate permitted by law, she has an affirmative burden to demonstrate that the lender knew or should have known of the facts justifying that lower rate.'" *Debtor's Brief at (III)(B)(3)(b)* (*quoting Escher v. Decision One*, 369 B.R. 862, 877 (Bankr. E.D.Pa.2007) and *citing Madera v. Ameriquest*, 388 B.R. 586, 599–600 (E.D.Pa. 2008)). Nevertheless, Debtor argues that, under the facts of this case, CIT should

have asked Habana about the existence of previous title insurance. *Debtor's Supporting Brief at (III)(B)(3)(b)*. In support of this argument, Debtor asserts that (i) "Habana orchestrated the refinance and communicated several times with CIT"; (ii) the 1999 title insurance held by Habana was only issued to it and not to Debtor; and (iii) the Loan Closing took place in Habana's office. *Id.* However, the extent of Habana's involvement in the refinancing is in dispute. Moreover, while Habana was the "insured" on the 1999 title insurance, Debtor is listed as the individual in whom the interest in land was vested and there is no evidence in the record that only Habana and not Debtor received written notice of the policy when it was issued. Standing alone, the fact that the CIT Loan closing took place at Habana's office is wholly insufficient to conclude that CIT was responsible for asking Habana whether previous title insurance existed.

However, if Debtor's testimony is believed (that Biddle rather than she communicated with CIT regarding her refinancing) and all justifiable inferences are drawn in her favor, there is evidence in the record from which a rational person could conclude that CIT knew or should have known, based on the information which it received from Biddle,[20] that Debtor was entitled to a lower rate on her title insur-

---

19. The refinance rate is 80% of the reissue rate which, for a loan of $51,660 in March of 2001, was $486.68. The reissue rate applies when "the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the earlier policy is produced notwithstanding the amount of coverage provided by the prior policy." TIRBOP Manual § 5.3.

20. CIT submitted undisputed evidence in support of its Motion that Debtor did not recall buying previous title insurance and that she did not bring anything with her to the closing on her loan from CIT. *Harris–Pena Dep.* at

103–04. Consequently, there is no evidence that CIT knew or should have known from its communications or documents from Debtor that she was entitled to the refinance rate rather than the basic rate on her title insurance. However, as noted above, the facts are in dispute as to whether CIT knew or should have known, vis-a-vis its communications with and/or from documents which it received from Biddle, that Debtor was entitled to a lower rate on her title insurance. Moreover, Exhibit H–15 to the Harris–Pena Dep. indicates that it may have been CIT and not the Debtor who obtained title insurance for the Debtor.

ance. Consequently, under the foregoing analysis of the law and facts,[21] there are material facts in dispute which prevent the Court from deciding, at this stage of the litigation, whether the amount which Debtor was charged for title insurance was reasonable.

### Title Examination Fee

■ Debtor contends that the $75.00 title examination fee which she was charged was unreasonable and, therefore, should have been included as part of the disclosed finance charge. In support of her contention, Debtor cites to § 2.3 of the TIRBOP Manual which limits and defines the circumstances under which an insurer may impose additional charges for examining a title. This section states:

> Insurer may impose additional Charges for examination of title which may involve multiple chains of title, land under water, coal, oil, gas or mineral searches, railroad property searches, land in bed of streets, rights-of-way, driveways, foreclosure, tax sales, proceedings under federal bankruptcy or state insolvency related statutes, or which involve other unusual difficulties or unusual expenditures. There shall be a reasonable relationship between the services performed, expenses incurred an the amount charged by the Insurer or Agent.

TIRBOP Manual § 2.3. The material which Debtor has submitted in support of her motion for summary judgment indicates that none of the circumstances listed in § 2.3 existed in this case. CIT failed to submit anything that showed that any of the circumstances did exist. Therefore, pursuant to § 2.3 of the TIRBOP Manual, the $75.00 which Debtor was charged for a title examination was unreasonable and it should have been included as part of the finance charge.

### Safe Harbor

TILA contains a "safe harbor" or margin of error for finance charge disclosures. *Strong v. Option One Mortgage Corporation (In re Strong)*, 356 B.R. 121, 165 (Bankr.E.D.Pa.2004), *aff'd*, 2005 WL 1463245 (E.D.Pa. June 20, 2005). In other words, the amount disclosed as a finance charge is considered accurate despite the fact that it varies from the actual finance charge if it fits within certain tolerance ranges. Pursuant to 15 U.S.C. § 1605(f), the amount disclosed as the finance charge

---

**21.** Importantly, the bankruptcy court decision in *Escher v. Decision One*, was recently reversed on the legal point at issue here, namely whether a borrower who contends that a lender failed to obtain the lowest title insurance rate permitted by law bears the burden of demonstrating that, at the time of the closing, the lender knew or should have known of the facts justifying the lower rate. *See Escher v. Decision One Mortgage Company, LLC*, 417 B.R. 245, 251–57 (Bankr.E.D.Pa.2009). On appeal, the district court held that, prior to the amendments made to TIRBOP in 2005, a borrower was entitled to the refinance rate pursuant to § 5.6 of TIRBOP when the following four requirements were met: (1) the refinance occurred within three years of the closing of a previous mortgage; (2) there was title insurance on the previous mortgage; (3) the insured property was identical to the property to be insured; and (4) ownership of the property had not changed. Notably absent from this list of requirements is any burden on the borrower to provide evidence to the lender, at or prior to the closing, of preexisting title insurance to qualify for the refinance rate. While this Court is not bound to follow the district court's ruling in *Escher* in this case, see *Krasny v. Pratpal Bagga (In re Jamuna Real Estate, LLC)*, 365 B.R. 540, 573 n. 29 (Bankr.E.D.Pa.2007); *In re Morningstar Enterprises, Inc.*, 128 B.R. 102, 106 n. 1 (Bankr.E.D.Pa.1991), it certainly may do so. However, depending on the evidence that is presented at trial, this Court may find it unnecessary to decide whether to apply the district court's decision in Escher to the instant case, so no further comment on this aspect of the matters is necessary at this juncture.

and other disclosures affected by the finance charge are "treated as being accurate ... if the amount disclosed as the finance charge ... does not vary from the actual finance charge by more than $100[.]" 15 U.S.C. § 1505(f). Consequently, even though the $75.00 which Debtor was charged for a title examination should have been disclosed as part of the finance charge, the difference between the amount disclosed as the finance charge and the actual finance charge is less than $100.00, which means that, for purposes of TILA, the amount which CIT disclosed as the finance charge will be treated as accurate if Debtor fails to prove at trial that the amount which she was charged for title insurance was unreasonable.[22] However, since the issue of whether Debtor was charged a reasonable amount for title insurance is in dispute, neither party is entitled to summary judgment on Debtor's TILA.

## IV. HOEPA Claim

■■■ HOEPA was enacted as an amendment to TILA "to address predatory lending practices targeted at vulnerable consumers." Eugene Kelly, Jr. et al., *An Overview of HOEPA, Old and New*, 59 Consumer Fin. L.Q. Rep. 203 (Fall, 2005) [hereinafter an *"An Overview of HOEPA"*]. It created "a special class of regulated loans that are made at higher interest rates or with excessive costs and fees." *In re Community Bank of Northern Virgi-*

*nia*, 418 F.3d 277, 304 (3d Cir.2005). Loans within the scope of HOEPA ("HOEPA loans") are subject to more "stringent disclosure requirements." An Overview of HOEPA at 203. *See also Ross v. Citifinancial Mortgage Co., Inc. (In re Ross)*, 338 B.R. 266, 270 (Bankr.E.D.Pa.2006) (noting that additional disclosures beyond those generally required by TILA must be provided for HOEPA mortgages). Under HOEPA, material disclosures must be given "not less than three business days" prior to the transaction's consummation. 15 U.S.C. § 1639(b)(1).

■■ A loan is subject to more heightened disclosure requirements of HOEPA if "the total points and fees payable by the consumer at or before closing ... exceed the greater of (i) 8 percent of the total loan amount or (ii) $400." 15 U.S.C. § 1602(aa)(1)(B). In order to determine whether a loan is subject to HOEPA, courts must apply the following two-step analysis: (1) determine the amount of "points and fees"; and (2) determine whether those points and fees exceed 8% of the loan amount. *Bell v. Parkway Mortgage, Inc. (In re Bell)*, 309 B.R. 139, 150 (Bankr.E.D.Pa.), *reconsideration granted in part on other grounds*, 314 B.R. 54 (Bankr.E.D.Pa.2004).

**Points and Fees Analysis**

According to § 1602(aa)(4), "points and fees" include:

---

22. Notably, CIT contends that it overdisclosed the finance charge by $179.00 consisting of: (i) a $4.00 Credit Bureau Fee; and (ii) a $175.00 Closing/Escrow/Settlement Fee. While credit report fees are not finance charges so long as they are bona fide and reasonable in amount, *see* 12 C.F.R. § 226.4(c)(7)(iii), there is not sufficient evidence in the record to enable the Court to determine, as a factual and legal matter, whether the $175.00 Closing/Escrow/Settlement Fee was a finance charge. This issue is discussed in the Court's discussion of Debt-

or's claim under HOEPA. *See Discussion in Section IV(c).* In the event the Court concludes, after trial, that the $175.00 Closing/Escrow/Settlement Fee was not a finance charge, then CIT would have overdisclosed the finance charges in connection with the CIT Loan by $179.00. This conclusion would mean that even if CIT should have included the $151.41 which Debtor was charged in excess of the refinance rate in its disclosure of finance charges, CIT would still be within the "safe harbor" for finance charge disclosures under 15 U.S.C. § 1505(f).

(A) all items included in the finance charge, except interest or the time-price differential;

(B) all compensation paid to mortgage brokers;

(C) each of the charges listed in section 1605(e) of this title (except an escrow for future payment of taxes), unless

(i) the charge is reasonable;

(ii) the creditor receives no direct or indirect compensation; and

(iii) the charge is paid to a third party unaffiliated with the creditor; and

(D) such other charges as the Board determines to be appropriate.

15 U.S.C. § 1602(4)(A)–(D). Regulation Z also defines the phrase "points and fees," stating that it means:

(i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;

(ii) All compensation paid to mortgage brokers;

(iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

(iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage....[.]

12 C.F.R. § 226.32(b)(1).

 The parties agree that the points and fees include the following charges:

| | |
|---|---|
| $ 495.00 | Underwriting fee to CIT |
| $ 504.10 | Loan discount fee to CIT |
| $ 42.00 | Appraisal review fee to CIT |
| $2,550.00 | Mortgage broker fee to Choice One Mortgage |
| $ 30.00 | Overnight courier fee to CIT |

TOTAL: $3,621.10

*See Memorandum of Law of the Defendant the CIT Group/Consumer Finance,*

*Inc. In Support of its Motion for Summary Judgment ("Defendant's Memorandum") at 17–18; Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment as to Defendant CIT Group/Consumer Finance Inc. ("Plaintiff's Memorandum") at Section III(C) & table in Section III(B)(1).* However, Debtor contends the points and fees also include the following four amounts: (i) the $75.00 title examination fee; (ii) the $151.41 which she was charged for title insurance in excess of the refinance rate; (iv) the $175.00 closing/escrow/settlement fee; and (iv) the $4.00 credit bureau fee. Reviewing these fees, the Court finds that there are disputed issues of material fact which preclude the Court from granting summary judgment on Debtor's HOEPA claim.

### (a) Title Examination Fee

Pursuant to 12 C.F.R. § 226.32, "points and fees" includes all items listed in § 226.4(c)(7) "unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor[.]" 12 C.F.R. § 226.32. Fees for title examination are one of the charges specifically listed in § 226(c)(7)(i). "The term 'reasonable' has been defined as whether the charge was for a service 'actually performed,' *In re Bell,* 309 B.R. 139, 151–52 (Bankr.E.D.Pa. 2004), and whether 'the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction,' *In re Crisomia,* 2002 WL 31202722, at *7 (Bankr.E.D.Pa. Sept.13, 2002) [citation omitted]." *Strong v. Option One Mortgage Corporation (In re Strong),* 356 B.R. 121 (Bankr.E.D.Pa.2004).

As discussed above, the $75.00 title examination fee which Debtor was charged was unreasonable under § 2.3 of TIRBOP.

Consequently, in accordance with 12 C.F.R. § 226.32, it counts as points and fees under HOEPA.

### (b) Title Insurance Fee

Title insurance is also one of the items listed in § 226.4(c)(7). As discussed above, there are material facts in dispute which prevent the Court from determining whether the amount which Debtor was charged for title insurance was reasonable. Therefore, no determination can be made, at this stage of the litigation, whether the title insurance fee should be included as part of the points and fee calculation.

### (c) Closing/Escrow/Settlement Fee

According to the HUD–1 Settlement Statement, Debtor was charged a $175 "Closing/Escrow/Settlement Fee." This fee went to Express Financial Services which, it appears from the record on summary judgment, served as the closing or settlement agent for CIT's loan to Debtor. *See Exhibit H–16 ("Settlement Statement") to Harris–Pena Dep.*[23] However, there is no evidence in the record showing what service(s) the $175.00 fee covered.

24 C.F.R. § 3500.2, which deals with the Real Estate Settlement Procedures Act (commonly known as RESPA), provides insight on the reason this category on the HUD–1 Settlement Statement is titled "Closing/Escrow/Settlement Fee". Section 3500.2 states:

> Settlement means the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan. This process may also be called "closing" or "escrow" in different jurisdictions.

24 C.F.R. § 3500.2 (current through March 30, 2001).[24]

The Court note that 12 C.F.R. § 226.4(a)(2) contains a special rule applicable to closing agent charges. This provision states:

> Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:
>
> (i) Requires the particular services for which the consumer is charged;
>
> (ii) Requires the imposition of the charge; or
>
> (iii) Retains a portion of the third-party charge to the extent of the portion retained.

12 C.F.R. § 226.4(a)(2). Assuming that this provision is applicable to the closing/escrow/settlement fee, neither party has provided any evidence in the record on whether the conditions of § 226.4(a)(2) are met.

On the other hand, the Court notes that the Official Staff Interpretation to § 226.4(a)(2) states that a "charge for conducting or attending a closing is a finance charge and may be excluded only if the charge is included in and is incidental to a lump sum closing fee excluded under § 226.4(c)(7)." Applying this statement, a fee charged by a closing agent for "executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan" could be interpreted as constituting a "finance charge."

In short, the record on summary judgment is inadequate. It fails to disclose what service(s) the $175.00 covered. Without such information, the Court cannot begin to determine how to apply the rele-

---

**23.** The category entitled "Closing/Escrow/Settlement Fee" appears on line 1101 of page 2 of the HUD–1 Statement.

**24.** Since the Loan Closing occurred in March of 2001, the version of 24 C.F.R. § 3500.2 that was current through March of 2001 is applicable hereto.

vant federal regulations to decide whether the $175.00 fee constitutes points and fees for purposes of HOEPA.

### (d) Credit Bureau Fee

Debtor was charged $4.00 for a "Credit Bureau Fee." Presumably this charge was for obtaining a credit report. Since 12 C.F.R. § 226.4(c)(7) lists "credit report fees," this charge is included as part of the points and fee calculation under 12 C.F.R. § 226.32(b)(iii) "unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor[.]" According to the HUD–1 Settlement Statement, this charge was paid to CIT. The Official Staff Interpretation to interpretation to § 226.32(b)(iii) states:

> Example. Section 226.32(b)(1)(iii) defines "points and fees" to include all items listed in § 226.4(c)(7), other than amounts held for the future payment of taxes. An item listed in § 226.4(c)(7) may be excluded from the "points and fees" calculation, however, if the charge is reasonable, the creditor receives no direct or indirect compensation from the charge, and the charge is not paid to an affiliate of the creditor. For example, a reasonable fee paid by the consumer to an independent, third-party appraiser may be excluded from the "points and fees" calculation (assuming no compensation is paid to the creditor). A fee paid by the consumer for an appraisal performed by the creditor must be included in the calculation, even though the fee may be excluded from the finance charge if it is bona fide and reasonable in amount.

12 C.F.R., Supplement I to Part 226— Official Staff Interpretations. Since the $4.00 Credit Bureau Fee was paid to CIT, the Court concludes, based on the example set forth in the Official Staff Interpretation

for § 226.32(b)(iii), that it should have been included in the points and fee calculation. *See Bell*, 309 B.R. at 150–51 (ruling the credit report fee was part of points and fees because it was paid to the lender).

### (e) Total Points and Fees

With the addition of the $75.00 Title Examination Fee and the $4.00 Credit Bureau Fee to the $3,621.10 which the parties agree constitutes points and fees, the total points and fees, excluding the charges in dispute, are $3,700.10. The next step is to determine whether $3,700.10 is less than 8% of the total loan amount.

### Total Loan Amount Analysis

According to the Official Commentary for 12 C.F.R. § 226.32(a)(1)(H), "the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b)(1) and financed by the creditor." 12 C.F.R., Supplement I to Part 226, Paragraph 32(a)(1)(ii). Section 226.18(b) provides, in pertinent part:

> The amount financed is calculated by:
>
> (1) Determining the principal loan amount or the cash price (subtracting any downpayment);
>
> (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
>
> (3) Subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b). The principal loan amount was $51,660.00. Neither party contends that there are any amounts to be added under subsection (2) above. Plus, both parties agree that the prepaid finance charge is, at a minimum, $3,621.10. *See Defendant's Memorandum at 18* (listing the prepaid finance changes as $3,621.10);

*Plaintiff's Memorandum at 18* (listing the prepaid finance charges at $3,800.10 but including $4.00 Credit Bureau Fee and the $175.00 Closing/Escrow/Settlement Fee in that amount). Utilizing this figure ($3,621.10) as the amount of prepaid finance charges, the total loan amount was $48,038.90.

**Calculation of Points and Fees as a Percentage of the Total Loan Amount**

Assuming that the points and fees equal $3,700.10, which does not include either of the charges in dispute, then the points and fees are only 7.7% of the loan ($51,660.00–$3,621.10 = $48,038.90 and $3,700.10 + $48,038.90 = 77%). However, the points and fees may also include: (i) the $151.41 which the Debtor was charged for title insurance in excess of the refinance rate; and (ii) the $175.00 Closing/Escrow/Settlement Fee which she was charged. According to the Court's calculations, if these amounts are included as points and fees, then the point and fees will not be less than 8% of the total loan amount, which will mean that Debtor's loan from CIT was within the scope of HOEPA. Consequently, Debtor's HOEPA claim under Count III of the Complaint cannot be decided in either parties' favor on summary judgment.

## V. Summary

For the reasons set forth above, summary judgment shall be granted in Debtor's favor and against CIT as to liability on her claim under Act 6 in Count I of the Amended Complaint. Both parties' motions for summary judgment shall be denied with respect to Debtor's other claims.

## ORDER

**AND NOW,** this *13th* day of October, 2009, upon consideration of the Plaintiff's Motion for Partial Summary Judgment and the Motion of Defendant the CIT Group/Consumer Finance Inc. for Summary Judgment to Dismiss with Prejudice the Amended Complaint, it is hereby **OR-DERED** and **DECREED** that:

1. Summary judgment is **GRANTED** in Debtor's favor and against CIT as to liability on her claim under Act 6 in Count I of the Amended Complaint; and

2. Both parties' motions for summary judgment are **DENIED** as to all other claims in the Amended Complaint.